No. 25-_____
_____

**In the**
**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**
_____

**In re With Purpose, Inc.,**
*Debtor*
_____

**With Purpose, Inc. and WPI Collateral Management, LLC,**
*Appellants,*
***v.***

**Scott M. Seidel, Trustee; GloriFi Acquisitions, LLC; and Jackson Investment Group, LLC,**
*Appellees.*
_____

**On Appeal from the United States Bankruptcy Court**
**for the Northern District of Texas, Dallas Division**
*Honorable Michelle V. Larson, Bankruptcy Judge*
*Case No. 23-30246-MVL17*
_____

**PETITION FOR DIRECT APPEAL**
**(under 28 U.S.C. § 158(d))**
_____

**Ryan Downton**
State Bar No. 24036500
**ryan@thetexastrialgroup.com**
**The Texas Trial Group, PC**
875 Carr 693, Ste. 103
Dorado, Puerto Rico 00646
Telephone: 512-680-7947

*Attorney for WPI Collateral*
*Management, LLC*

**Jeffrey S. Levinger**
State Bar No. 122588300
**jlevinger@levingerpc.com**
**J. Carl Cecere (of Counsel)**
State Bar No. 24050397
ccecere@cecerepc.com
**Levinger PC**
1700 Pacific Ave., Suite 2390
Dallas, TX 75202
Telephone: 214-855-6817
Facsimile: 214-817-4590

*Attorneys for With Purpose, Inc.*

No. 25-_____; *With Purpose, Inc. et al. v. Scott M. Seidel, et al.*

The undersigned counsel of record certifies that the following listed persons and entities covered under 5TH CIR. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## Appellants

With Purpose, Inc.
WPI Collateral Management, LLC

## Counsel for Appellant With Purpose, Inc.

| | |
|---|---|
| Jeffrey S. Levinger | Frank J. Wright |
| J. Carl Cecere (Of Counsel) | Jeffery M. Veteto |
| Levinger PC | Law Offices of Frank J. Wright, PLLC |
| 1700 Pacific Ave., Suite 2390 | 1800 Valley View Lane, Suite 250 |
| Dallas, TX 75202 | Farmers Branch, TX 75234 |
| (appellate counsel) | (bankruptcy court counsel) |

## Counsel for Appellant WPI Collateral Management, LLC

| | |
|---|---|
| Ryan Downton | Joshua Eppich |
| The Texas Trial Group | Bonds Ellis Eppich Schafer Jones LLP |
| 875 Carr 693, Ste. 103 | 420 Throckmorton Street, Suite 1000 |
| Dorado, PR 00646 | Fort Worth, Texas 76102 |

## Appellees

Scott M. Seidel, Trustee
GloriFi Acquisitions, LLC
Jackson Investment Group, LLC

**Counsel for Appellee Scott M. Seidel**

Davor Rukavina
Thomas D. Berghman
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201

**Counsel for Appellees GloriFi Acquisitions, LLC and Jackson Investment Group, LLC**

Charles J. Cooper
Vincent J. Colatriano
Harold S. Reeves
Cooper & Kirk, PLLC
1523 New Hampshipre Ave., N.W.
Washington, D.C. 20036
(appellate counsel)

Paul M. Rosenblatt
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
(bankruptcy court counsel)

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

*Attorney of Record for With Purpose, Inc.*

# TABLE OF CONTENTS

Certificate of Interested Persons ...................................................................i

Index of Authorities ...................................................................iv

Factual and Procedural Background ...................................................................2

Appellants' Questions on Appeal ...................................................................6

Reasons Why Direct Appeal Should be Allowed ...................................................................8

I.      The basis for certification. ...................................................................9

II.     A direct appeal will materially advance the case's progress. ...................................................................9

Relief Sought ...................................................................10

Certificate of Service ...................................................................12

Certificate of Compliance ...................................................................13

ECF Certification ...................................................................13

# INDEX OF AUTHORITIES

**Cases**

*In re Qimonda AG,*
  70 B.R. 374 (E.D.Va. 2012)..................................................................8

**Statutes**

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,
  Pub. L. 109-8, 119 Stat. 23.................................................................8

11 U.S.C. § 363(m) ...............................................................................7

11 U.S.C. § 706(a) ............................................................................6, 7

28 U.S.C. § 158....................................................................................8

28 U.S.C. § 158(d) ...........................................................................6, 8

28 U.S.C. § 158(d)(2)............................................................................9

28 U.S.C. § 158(d)(2)(A) ............................................................. 1, 9, 10

28 U.S.C. § 158(d)(2)(A)(i) ...................................................................6

28 U.S.C. § 158(d)(2)(A)(ii) ..................................................................6

28 U.S.C. § 158(d)(2)(A)(iii) ........................................................ 1, 6, 9

**Rules**

FED. R. APP. P. 5 ...................................................................................1

FED. R. BANKR. P. 706(a)........................................................................5

FED. R. BANKR. P. 8009 ..........................................................................1

FED. R. BANKR. P. 9019 ..........................................................................1

**To the Honorable Court:**

Pursuant to 28 U.S.C. § 158(d)(2)(A), Federal Rule of Appellate Procedure 5, and Federal Rule of Bankruptcy Procedure 8009, Appellants With Purpose, Inc. and WPI Collateral Management, LLC ("Appellants") respectfully request that the Court authorize a direct appeal from the Bankruptcy Court to this Court of the following orders of the Bankruptcy Court: the *Memorandum Opinion Denying Conversion to Chapter 11 and Granting the Trustee's Compromise with Jackson Investment Group Pursuant to 9019 of the Federal Rules of Bankruptcy Procedure* (the "Memorandum Opinion") entered on January 22, 2025 (Ex. 1, attached hereto); the *Order Denying Motion to Convert Case to Chapter 11* (the "Conversion Order") entered on January 24, 2025 (Ex. 2, attached hereto); and the *Order Granting Trustee's Motion for Approval of Compromise and Settlement with, and Sale to, Jackson Investment Group, LLC* (the "JIG Order") entered on January 24, 2025 (Ex. 3, attached hereto).

Both Appellants and Appellees agree that a direct appeal to this Court may materially advance the progress of the bankruptcy proceeding in which the appeal is taken, making a direct appeal appropriate under 28 U.S.C. § 158(d)(2)(A)(iii). To that end, Appellants and Appellees Scott Seidel, GloriFi Acquisitions, LLC, and Jackson Investment Group, LLC ("Appellees") filed in the Bankruptcy Court a *Certification to Court of Appeals by All Parties* (the "Certification") on February 19, 2025. (Ex. 4, attached hereto)

## FACTUAL AND PROCEDURAL BACKGROUND

This case concerns the bankruptcy of With Purpose, Inc. (the "Debtor"), a banking and finance company that did business under the name GloriFi. GloriFi aimed to provide a comprehensive package of financial products, including credit cards, banking, insurance, mortgage, and brokerage services, to 100 million Americans looking for such services from a company that shared their conservative values. (ECF No. 151 at 3, ¶7, Case No. 23-30246-MVL17)) Recognizing the potential in this underserved market, investor Toby Neugebauer founded GloriFi in 2021, serving as its CEO and largest shareholder. (ECF No. 275-4 at 2-3, 29, ¶¶2, 77)

Within months of its launch, GloriFi's valuation skyrocketed, quickly exceeding $1 billion. (ECF No. 275-4 at 3-4, 22 ¶¶3-4, 65) The strength of the GloriFi concept soon attracted some of the biggest names in conservative politics and venture capital to serve as its executives, directors, or outside investors—names like Nicholas Ayers, former Chief of Staff of Vice President Mike Pence; Peter Thiel, technology investor and founder of PayPal; Jeffrey Sprecher, whose company InterContinental Exchange owns the New York Stock Exchange; and former presidential candidate Vivek Ramaswamy (collectively with those listed below the

"Outside Investors").[1] (ECF No. 275-4 at 20-23, ¶¶ 61-63, 66) Ultimately, however, With Purpose was forced to seek bankruptcy protection under Chapter 7 in February 2023.

One of the Debtor's most important assets was its causes of action against the persons and entities responsible for driving it into bankruptcy—causes of action that the Chapter 7 Trustee, Scott Seidel, acknowledged to be the "soul of the case." (ECF No. 369 at 13) Once the Trustee was appointed, he conducted an investigation involving "review of hundreds of thousands of pages of discovery" through which he learned "facts that likely support[ed] potential Causes of Action related to the demise of the Debtor" and he identified causes of action "against many of those who were in positions of power or influence within the Debtor's organization"— including Neugebauer, those aligned with him, and the Outside Investors. (ECF No. 186 at 4-5, ¶¶10-11; *id.* at 5, ¶14 [("[T]he Trustee believes that colorable causes of action exist against everyone that the proverbial finger had been pointed at, included Neugebauer and the early investors."]).

---

[1] Other Outside Investors include: Citadel LLC, Richard Jackson, Joseph Lonsdale, the Founders Fund VII, LP, the Founders Fund VII Entrepreneurs Fund, L.P., the Founders Fund VII Principals Fund, LP, Cason Carter, GFNCI LLC, Ayers Family Holdings LLC, J. Nicholas Ayers 2021 Irrevocable Trust, Jackson Investment Group, LLC, the Lonsdale Family Revocable Trust, Descante Capital, LLC, Vivek Ramaswamy Investments LLC, Seven Talents, LLC, amongst others. (ECF No. 275-4 at 4-10, ¶¶7-35)

The central controversy between the parties concerns how and by whom these causes of action ought to be asserted. Initially, the Debtor filed a motion to convert the case from a Chapter 7 to a Chapter 11 in part to resolve these questions. (ECF No. 217) The Trustee, however, approached Neugebauer and WPI Collateral Management, LLC (the "Collateral Agent") about pursuing the causes of action under a "joint prosecution agreement" with the Trustee. The parties agreed to that arrangement and the Trustee sought approval from the bankruptcy court to enter into it through a *Motion for Approval of Compromise and Settlement Under Bankruptcy Rule 9019 with the Collateral Agent and with Neugebauer Parties and for Approval of Postpetition Financing* (the "Collateral Agent 9019 Motion"). (ECF No. 223)

But then Jackson Investment Group ("JIG"), which is included among and aligned with the Outside Investors, approached the Trustee with an alternate plan in which it would purchase the intellectual property rights associated with the "GloriFi" name and contribute $6 million to obtain the "right to pursue estate causes of action" through a new company—GloriFi Acquisitions, LLC. (ECF No. 396 at 39)

Despite having already entered into a binding agreement with the Collateral Agent and Neugebauer, for which he had previously sought Bankruptcy Court approval, the Trustee abandoned that agreement and deemed JIG's offer to be "higher and better" than the settlement memorialized in the Collateral Agent 9019 Motion. (ECF No. 396 at 8) The Trustee then sought approval of his agreement with

JIG by filing a *Motion for Approval of Compromise and Settlement under Bankruptcy Rule 9019 and Sale of Assets* (the "JIG Motion"). (ECF No. 258)

Meanwhile, the Debtor, with the support of "all secured creditors and a significant portion of [the] unsecured creditors," as well as a majority of the shareholders, pursued the previously filed motion seeking to convert the case from a Chapter 7 liquidation to a Chapter 11 reorganization that would be funded with proceeds from pursuing the Estate's causes of action. *See Amended Motion to Convert Bankruptcy Case to Chapter 11 Pursuant to Section 706(a) of the Bankruptcy Code* ("Motion to Convert"). (ECF No. 275) This was no ordinary request for conversion: It included a well-thought-out and complete plan of reorganization, accompanied by a draft of the Chapter 11 plan, a draft disclosure statement, a restructuring support agreement, a draft complaint against the Outside Investors, $2 million of debtor-in-possession financing, and a commitment from former Bankruptcy Judge Leif Clark to serve as the Chief Restructuring Officer. (ECF No. 275-1, 275-2, 275-3, 275-4)

The Bankruptcy Court heard both the Motion to Convert and the JIG Motion over seven days in September and October 2024. (Ex. 1 at 10) But the court did not issue its decisions on those motions until late January 2025 (collectively the "Orders on Appeal").

The Bankruptcy Court denied the Motion to Convert under 11 U.S.C. § 706(a), basing its ruling on the Debtor's purported "abuse of process" and a determination that there would be "cause for reconversion" if the case were to be converted to a Chapter 11. (Ex. 1 at 25-30, 32-38) The Bankruptcy Court also granted the JIG Motion. It held that the Trustee had the power to enter, and the court had the power to approve, the JIG Agreement as a "compromise and settlement of claims held by the bankruptcy estate." (*Id*. 40)

The Debtor and the Collateral Agent timely appealed from the Orders on Appeal. (ECF No. 420) On February 19, 2025, Appellants and Appellees filed the Certification giving rise to this Petition for Direct Appeal. (ECF No. 459)

### APPELLANTS' QUESTIONS ON APPEAL[2]

As set forth in the Appellants' Statement of Issues filed in the Bankruptcy Court pursuant to FED. R. BANK. P. 8009 (*see* ECF No. 455), the questions on appeal will include the following:

---

[2] Appellants list these questions in order to comply with this Court's procedures for certification of appeals under 28 U.S.C. § 158(d). But Appellants note that Appellees did not agree to certification on the basis that these questions meet the standards set forth in 28 U.S.C. § 158(d)(2)(A)(i) or (ii). Instead, Appellees agreed to certification based solely on 28 U.S.C. § 158(d)(2)(A)(iii)—that an immediate appeal may materially advance the progress of the case.

I.  **Did the Bankruptcy Court improperly deny the Debtor's Motion to Convert the case from Chapter 7 to Chapter 11 pursuant to 11 U.S.C. § 706(a) when:**

a.  the Bankruptcy Court based its ruling principally on equitable considerations appearing nowhere in the Code and lacking legal and evidentiary support; and

b.  the Motion to Convert was supported by a restructuring agreement and proposed plan of reorganization backed by all of the estate's secured creditors, the majority of shareholders, a significant number of unsecured creditors, and a former bankruptcy judge willing to serve as chief restructuring officer?

II.  **Did the Bankruptcy Court improperly grant the JIG Motion when:**

a.  the Trustee's assignment of control over Estate causes of action to JIG's agent, a non-debtor, represents an improper *de facto* non-consensual release of claims against a non-debtor that is not permitted by the Code;

b.  assignment of control over Estate causes of action cannot be squared with the trustee's fiduciary duty to maximize recovery for the Estate when JIG is a target of those causes of action, and thereby has impermissible conflicts of interest;

c.  there is no legal authority for approving an agreement that is neither a "sale" of assets triggering applicability of 11 U.S.C. § 363(m) nor a "settlement" under FED. R. BANKR. P. 9019;

d.  JIG cannot qualify as a good-faith purchaser;

e.  the Trustee failed to disclose to creditors that the party to which he is assigning control over Estate causes of action will not assert those causes of action with potentially the most value;

f.  the Bankruptcy Court allowed JIG's proof of claim in full without first hearing the Collateral Agent's timely objection on the validity of such proof of claim;

g.  the Bankruptcy Court failed to determine the nature and extent of the Collateral Agent's security interest before ruling on the JIG Motion; and

h. the Bankruptcy Court improperly approved the JIG offer over the Collateral Agent's proposal, which included a credit bid of more than three times the JIG offer?

## REASONS WHY DIRECT APPEAL SHOULD BE ALLOWED

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23, amended 28 U.S.C. § 158 to give parties the option of obtaining a direct certified appeal from a judgment or an order of the bankruptcy court to the court of appeals, thereby bypassing a district court's intermediate appellate review.

This right to a direct appeal serves two essential purposes: "(i) to provide quicker and less costly means of resolving significant issues that are inevitably bound for the court of appeals, and (ii) to facilitate the development of more binding precedents in bankruptcy law." *In re Qimonda AG,* 470 B.R. 374, 382-83 (E.D.Va. 2012) (citing H.R. Rep. No. 109-31(7) at 148 (2005)).

To obtain a direct appeal, one of the following participants in the bankruptcy process must certify that the case is appropriate for a direct appeal under 28 U.S.C. § 158(d): (1) the bankruptcy court, district court, or bankruptcy appellate panel acting either on its own motion or at the request of any party to the judgment; or (2) all the appellants and appellees acting jointly.

The certification must state that the appeal meets one of the following criteria listed in section 158(d)(2)(A)(i)-(iii):

(i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court, or involves a matter of public importance;

(ii) the judgment, order or decree involves a question of law requiring resolution of conflicting decisions; or

(iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.

In the event that the appropriate certification is made under 28 U.S.C. § 158(d)(2)(A), the court of appeals has jurisdiction if it authorizes the direct appeal. *Id.* The Court should do so in this case for the following reasons.

## I. The basis for certification.

On February 19, 2025, Appellants and Appellees filed a Certification in the Bankruptcy Court stating that a circumstance specified in 28 U.S.C. § 158(d)(2) exists, warranting a direct appeal to the United States Court of Appeals for the Fifth Circuit. Specifically, all parties agreed that an immediate appeal of the Orders on Appeal to this Court may materially advance the progress of the case or proceeding in which the appeal is taken. (*See* Ex. 4, citing 28 U.S.C. § 158(d)(2)(A)(iii))

Accordingly, Appellees do not oppose the relief sought in this Petition for Direct Appeal.

## II. A direct appeal will materially advance the case's progress.

Authorizing a direct certified appeal will materially advance the progress of this case in several ways. In particular, bypassing intermediate district court review

will foster a prompt resolution of the appeal, which all parties agree is in the Estate's best interest.

Appellants want to see the appeal resolved as soon as possible so that they might ensure that they are able to pursue Estate causes of action against the Outside Investors before those causes of action are potentially lost to limitations or by actions of Appellees. For their part, Appellees desire finality and the ability to freely pursue (or not pursue) Estate causes of action.

Furthermore, all parties have stated that they intend to appeal to this Court any ruling of the district court that is adverse to them, thus ensuring that this Court will eventually have to decide this appeal one way or the other. Appellants therefore submit that it is in all parties' best interest to proceed with a direct appeal, which will save the parties significant time and expense. And certification will spare the district court from having to commit the time and resources necessary to render a decision that will potentially be replaced by a decision from this Court on the same issues.

## RELIEF SOUGHT

For all these reasons, Appellants respectfully request that the Court, pursuant to 28 U.S.C. § 158(d)(2)(A) and the parties' Certification, authorize the appeal from the Orders on Appeal to proceed directly in this Court.

Respectfully submitted,

/s/ Ryan Downton

**Ryan Downton**
State Bar No. 24036500
ryan@thetexastrialgroup.com
**The Texas Trial Group, PC**
875 Carr 694, Ste. 103
Dorado, Puerto Rico 00646
Telephone: 512-680-7947

*Attorney for WPI Collateral Management, LLC*

/s/ Jeffrey S. Levinger

**Jeffrey S. Levinger**
State Bar No. 122588300
jlevinger@levingerpc.com
**J. Carl Cecere (Of Counsel)**
State Bar No. 24050397
ccecere@cecerepc.com
**Levinger PC**
1700 Pacific Ave., Suite 2390
Dallas, TX 75201
Telephone: 214-855-6817
Facsimile: 214-855-6808

*Attorneys for With Purpose, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on March 19, 2025, this Petition for Direct

Appeal was served by email on the following counsel for Appellees:


Davor Rukavina
Thomas D. Berghman
Brenda P. Funk
Conor P. White
Munch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201

Paul M. Rosenblatt
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Stret NE, Suite 2800
Atlanta, GA 30309

Charles J. Cooper
Vincent J. Colatriano
Harold S. Reeves
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

## CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limitation of FED. R. APP. P. 21(d) because it contains 2,392 words, excluding the parts of the petition exempted by FED. R. APP. P. 32(f).

This petition complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-point font (and 13 point for footnotes).

*/s/ Jeffrey S. Levinger*
**Jeffrey S. Levinger**

## ECF CERTIFICATION

I certify that the required privacy redactions have been made pursuant to 5TH CIR. R. 25.2.13, the electronic submission is an exact copy of the paper submission, and the document has been scanned for viruses and is free of viruses.

*/s/ Jeffrey S. Levinger*
**Jeffrey S. Levinger**

# APPENDIX

# Exhibit 1

**Memorandum Opinion**

**(Doc. No. 396)**



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 22, 2025**

_____
**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **With Purpose, Inc.,** | § | **Case No. 23-30246-MVL7** |
| | § | |
| **Debtor.** | § | |
| | § | |

---

**MEMORANDUM OPINION DENYING CONVERSION TO CHAPTER 11 AND GRANTING THE TRUSTEE'S COMPROMISE WITH JACKSON INVESTMENT GROUP PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEUDRE**

Before the Court are two motions: (1) the *Amended Motion to Convert Bankruptcy Case to Chapter 11 Pursuant to Section 706(a) of the Bankruptcy Code* (the "**Motion to Convert**") [ECF No. 275] filed by With Purpose, Inc. (the "**Debtor**" or "**GloriFi**") and (2) the *Trustee's Motion for Approval of Compromise and Settlement Under Bankruptcy Rule 9019 and Sale of Assets* (the "**Jackson 9019 Motion**") [ECF No. 258] filed by the duly appointed Chapter 7 trustee, Scott M.

1

Seidel (the "**Trustee**"). The compromise proposed between Jackson Investment Group ("**JIG**") and the Trustee on behalf of the estate is set forth in the Agreement attached to the Jackson 9019 Motion (the "**Jackson Compromise**"). For the reasons set forth herein, the Court will DENY the Motion to Convert and GRANT the Jackson 9019 Motion as more particularly explained herein.

### I.   JURISDICTION

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Consideration of this matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

### II.   PROCEDURAL HISTORY

On February 8, 2023, the Debtor filed its voluntary Chapter 7 petition. ECF No. 1. The Petition was signed by Toby R. Neugebauer, as the Manager of the Debtor. *Id.* Scott M. Seidel was appointed the Chapter 7 Trustee for this case. On February 9, 2023, the Debtor filed its Schedules, therein identifying assets valued at $595,956.41 and liabilities totaling $40,080,301.74. ECF No. 9. In its original Schedules, the Debtor also identified certain causes of action against third parties, both pending and potential. *Id.* at 36. In particular, the Debtor noted a potential cause of action against OnPoint Companies, LLC ("**OnPoint**"), the initial collateral agent for the Series 2 noteholders, "arising out of the alleged partial foreclosure of the Debtor's Intellectual Property." *Id.* at 36-37. The Debtor also lists an existing arbitration against James Nicholas Ayers for breach of confidentiality and proprietary rights agreement, disparagement, and tortious interference. *Id.* at 36. On March 8, 2023, the Debtor filed its Amended Schedules, therein making limited updates to such causes of action. ECF No. 31. In both iterations of the Schedules, the value of the causes of action is scheduled as "unknown" and not mathematically included in the total asset valuation.

*See id.* at 14-15.   The meeting of creditors was held and concluded on March 10, 2023, with the Trustee determining that there were assets to be administered in this case. ECF No. 36.

On November 29, 2023, the Trustee filed his *Motion for Entry of (I) an Order, (A) Approving Bid and Noticing Procedures, (B) Scheduling an Auction and Hearing, and (C) Granting Related Relief; and (II) an Order (A) Approving Sale of Debtor Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, and (B) Granting Related Relief* (the "**Sale Motion**") [ECF No. 151], seeking to sell "all the Debtor's assets including the [Debtor's] Causes of Action." ECF No. 151, at 2. On December 20, 2023, OnPoint filed an objection to the Sale Motion, contending, in part, that the non-litigation assets being sold were not property of the bankruptcy estate because it had allegedly foreclosed upon those assets prepetition. ECF No. 162. A hearing was held on the Sale Motion on December 21, 2023. At the hearing, counsel for the Trustee stated that they resolved OnPoint's objection by proposing a settlement agreement with OnPoint that would unwind OnPoint's purported prepetition foreclosure of the assets and restore parties to their pre-foreclosure posture. *See* ECF No. 165, at 17. As such, the Sale Motion was continued to allow for further agreements to be reached with interested parties prior to the auction. ECF No. 164.

On February 16, 2024, the Trustee filed its *Motion for Approval of Settlement Agreement with OnPoint Companies, LLC* (the "**OnPoint 9019 Motion**"). ECF No. 172. Under the OnPoint 9019 Motion, OnPoint would tender to the Trustee the assets obtained as a result of the foreclosure and withdraw its objection to the sale motion. ECF No. 172, at 4-5. Pursuant to the OnPoint 9019 Motion, the Trustee would release the scheduled claims against OnPoint in connection with the foreclosure of the Debtor's intellectual property and amend the Sale Motion to carve out all other claims against OnPoint. *Id.* Finally, if any assets were sold by the Trustee, OnPoint's asserted liens

3

would remain on the assets, and the Trustee would be entitled to recover a surcharge of 20% of the proceeds of OnPoint's collateral, up to $160,000. *Id.*

Mr. Ayers, the J. Nicholas Ayers 2021 Irrevocable Trust, Ayers Family Holdings, LLC, and Keri Findley (collectively, the "**Ayers Parties**"), JIG, and Mr. Neugebauer each filed objections to the OnPoint 9019 Motion. *See* ECF Nos. 174, 177, & 175. Mr. Neugebauer objected to the OnPoint 9019 Motion, in part, because he asserted that OnPoint's foreclosure on the assets was wrongful and that the scheduled claims against OnPoint as the collateral agent were worth "tens of millions of dollars." ECF No. 175, at 5. On March 21, 2024, a status conference was held regarding the OnPoint 9019 Motion. ECF No. 184. At the status conference, the Trustee asked the court to continue the hearing on the OnPoint 9019 Motion so that he could confer with the objecting parties in an attempt to reach a resolution on the objections. *See* ECF No. 385. On April 5, 2024, the Trustee withdrew the OnPoint 9019 Motion. ECF No. 185. On April 22, 2024, OnPoint resigned as the collateral agent, and WPI Collateral Management, LLC (the "**Collateral Agent**") was appointed as its successor.

On April 10, 2024, the Trustee filed an amended sale motion (as amended, the "**Bid Procedures Motion**"), which limited the proposed sale to that of "the Estate's litigation assets, namely the Causes of Action." ECF No. 186, at 3. Both Mr. Neugebauer and the Collateral Agent filed objections to the Bid Procedures Motion.  *See* ECF Nos. 189 and 191. The Collateral Agent objected to the Bid Procedures Motion on the following grounds: (i) the Bid Procedures Motion did not provide sufficient information for any potential purchaser to identify exactly what assets are being sold and whether they are subject to the Collateral Agent's liens; (ii) the Trustee sought to sell the causes of action in bulk and did not delineate between Collateral Agent's causes of action and unencumbered causes of action; (iii) the Bid Procedures Motion did not require a purchaser to

4

allocate the proposed purchase price among the Collateral Agent's causes of action and the unencumbered causes of action; (iv) the Bid Procedures Motion did not provide a mechanism for the Collateral Agent to credit bid its secured claim on its collateral pursuant to section 363(f) of the Bankruptcy Code; and (v) the Trustee failed to show that he could satisfy section 363(f) of the Bankruptcy Code. ECF No. 191, at 5-6. Mr. Neugebauer objected to the Bid Procedures Motion on the following grounds: (i) the Trustee failed to identify the assets to be sold and thus failed to satisfy the business judgment standard; (ii) the Trustee failed to provide sufficient notice to parties in interest; (iii) the Trustee's decision to sell the causes of action rather than pursue an agency agreement with a bidder to pursue the actions robbed value from many potential causes of action; (iv) the Trustee's failure to list the various causes of action for sale gave potential bidders insufficient time to solicit and obtain litigation financing for the purchase of the causes of action; (v) the all-cash reserve price for management causes of action permitted targets of such causes of action to chill bidding from other parties; and (vi) the bid procedures order should also prohibit the sale of any foreclosed assets. ECF No. 189. The Court held a hearing on May 7, 2024, and subsequently granted the Amended Sale Motion. ECF No. 195. On May 17, 2024, the Court entered its *Order (A) Approving Bid and Noticing Procedures, (B) Scheduling an Auction and Hearing, and (C) Granting Related Relief* (the "**Bid Procedures Order**"), therein establishing June 17, 2024, as the auction date, with bids due on June 7, 2024. ECF No. 197.

On May 17, 2024, the same day as the entry of the Bid Procedures Order, Mr. Neugebauer, Banzai Capital Partners, LLC, Banzai Advisory Group, LLC, and Neugebauer Family Enterprises, LLC (collectively, the "**Neugebauer Parties**") filed a complaint in the United States District Court

for the District of Delaware (the "**Delaware Court**") against the Delaware Defendants,[1] thereby

initiating Civil Proceeding 1:24-cv-00599 (the "**Delaware Litigation**"). In the Delaware

Litigation, the Neugebauer Parties allege the following causes of action: (1) Breach of Contract

and Conspiracy to Breach Contract: Stockholders Agreement, and (2) Violations of RICO: 18

U.S.C. § 1962(c).

Also on May 17, 2024, the Collateral Agent and the Neugebauer Parties, filed a complaint

in the United States District Court for the Northern District of Georgia (the "**Georgia Court**")

against the Georgia Defendants,[2] thereby initiating Civil Proceeding 1:24-cv-02148 (the "**Georgia**

**Litigation**," together with the Delaware Proceeding, the "**DEGA Litigation**").   The Georgia

Litigation alleges the following causes of action: (1) Violation of the Georgia RICO Act: O.C.G.A.

§ 16-14-4(a); (2) Violation of the Georgia RICO Act: O.C.G.A. § 16-14-4(b); (3) Violation of the

Georgia RICO Act: O.C.G.A. § 16-14-1(c); (4) Theft of Trade Secrets Under Georgia Code § 10-

1-761, et seq.; (5) Violation of RICO: 18 U.S.C. § 1962(c); (6) Violation of the Lanham Act 15

U.S.C. § 1125; (7) Conspiracy to Breach Contract: Stockholders Agreement; (8) Punitive Damages

(O.C.G.A. § 51-12-5.1); and (9) Attorneys' Fees and Expenses.

The Trustee asserted that the initiation of the DEGA Litigation violated the automatic stay

by calling into question the ownership of the causes of action. On May 20 and 22, 2024, after filing

---

[1] The Founders Fund VII, LP, The Founders Fund VII Principals Fund, LP, the Founders Fund VII Entrepreneurs Fund, LP, Keri Findley, Cason Carter, Britt Amos, Jerome T. Fadden, Manuel Rios, Seven Talents, LLC, J. Nicholas Ayers 2021 Irrevocable Trust, Ayers Family Holdings LLC, Vivek Ramaswamy Investments LLC, Jackson Investment Group, LLC, GFNCI, LLC, Descante Capital, LLC, and The Lonsdale Family Revocable Trust Dated February 15, 2018 (collectively, the "**Delaware Defendants**").
[2] Vivek Ramaswamy, Strive Enterprises, Inc., Strive Asset Management, LLC, Joseph Ricketts, James Nick Ayers, Joseph Lonsdale, Peter Thiel, Jeffrey Sprecher, Richard Jackson, Breanne Harmsen, Jonathan Pennington, Old Glory Intellectual Property Holdings, LLC, Citadel, LLC, The Founders Fund VII, LP, The Founders Fund VII Principals Fund, LP, the Founders Fund VII Entrepreneurs Fund, LP, Keri Findley, Cason Carter, Britt Amos, Jerome T. Fadden, Manuel Rios, Seven Talents, LLC, J. Nicholas Ayers 2021 Irrevocable Trust, Ayers Family Holdings LLC, Zing America, Inc., Old Glory Holding Company, Vivek Ramaswamy Investments, LLC, Jackson Invesment Group, LLC, GFNCI, LLC, Descante Capital, LLC, and The Lonsdale Family Revocable Trust Dated February 15, 2018 (collectively, the "**Georgia Defendants**," and together with the Delaware Defendants, the "**DEGA Defendants**").

6

the DEGA Litigation, the Collateral Agent filed two motions to lift stay to pursue the Georgia

Litigation and foreclose on contractual claims. ECF Nos. 199, 201. Mr. Neugebauer never sought

to lift stay to pursue the Delaware Litigation.

On May 30, 2024, in response to the initiation of the DEGA Litigation, the Trustee filed an

adversary proceeding before this Court against each of the Neugebauer Parties, the Collateral

Agent, and OnPoint (the "**Adversary Proceeding**"). *See Seidel v. Neugebauer, et al.*, No. 24-3038

(Bankr. N.D. Tex. 2024). The Trustee filed the Adversary Proceeding to resolve the disputes related

to ownership of various causes of action by seeking declaratory relief as to who owns the causes

of action pleaded in the DEGA Litigation; to test the validity and extent of the Collateral Agent's

security interests against certain assets; to test the validity and extent of the prepetition foreclosure;

to seek to avoid the attachment and perfection of the Collateral Agent's security interests as insider

preferences; and to hold the Collateral Agent and the Neugebauer Parties accountable for their

alleged violations of the automatic stay. All parties agreed that time was of the essence. The Court

bifurcated the Adversary Proceeding as between liability and damages and set the trial on liability

to commence on July 24, 2024.

Due in part to the filing of the DEGA Litigation, on June 7, 2024, the Trustee extended the

bid deadline under the Bid Procedures Order to June 14, 2024 [ECF No. 212] and further extended

the bid deadline to June 24, 2024, on June 13, 2024 [ECF No. 215].

Before the Adversary Proceeding could be heard, on July 10, 2024, the Debtor filed its

original motion to convert case from Chapter 7 to Chapter 11. ECF No. 217. A hearing was set on

the original motion to convert for July 24, 2024. On July 17, 2024, the Trustee filed his *Motion for

Approval of Compromise and Settlement Under Bankruptcy Rule 9019 with the Collateral Agent

and with Neugebauer Parties and for Approval of Postpetition Financing* (the "**Neugebauer 9019**

7

**Motion**"). ECF No. 223.  As proposed, the Neugebauer 9019 Motion would have resolved the Adversary Proceeding, compromised the validity of the Collateral Agent's foreclosure, and approved a joint prosecution agreement between the Trustee, the Collateral Agent, and the Neugebauer Parties. Likewise, the Motion to Convert would have been withdrawn, among other things. *See id.* at 11-12. The Neugebauer 9019 Motion was set for hearing on August 15, 2024, and the Adversary Proceeding, the Motion to Convert, and the lift stay motions were abated. *See* ECF Nos. 225, 227.

JIG preliminarily objected to the Neugebauer 9019 Motion on July 29, 2024. ECF No. 230. In its objection, JIG stated that it was prepared to make a higher and better proposal than the Neugebauer 9019 Motion immediately. In the days following JIG's objection, JIG informed the Trustee of the general contours of the counterproposal, which prompted the Trustee to ask for an emergency status conference regarding the compromise or sale of estate claims on July 30, 3021. ECF No. 231. On August 1, 2024, the Court conducted an Emergency Status Conference regarding the Neugebauer 9019 Motion. ECF No. 241. In response to the news that the Trustee was considering other proposals, the Debtor filed an *Emergency Motion to Lift Abatement and Reset Hearing on Conversion Motion* on July 31, 2024. ECF No. 238.

At the Status Conference, the Trustee informed the Court that it had received JIG's counterproposal but needed time to determine whether it was the "higher and better" offer. ECF No. 268, at 9. At the conclusion of the status conference, the Court instructed the Trustee to advise interested parties of his assessment of the JIG's counterproposal to the Neugebauer 9019 Motion by August 5, 2024. *Id.* at 49-50. Additionally, the Court interposed a deadline of August 9th for any other party to make a differing offer or better an existing offer, noting colloquially on the record that "[i]t is time at this juncture to put up or shut up." *Id.* at 50-51.

On August 5, 2024, the Trustee filed his *Notice of Proposal*, which outlined the JIG counterproposal, stating that he felt that the JIG offer was superior to that of the Neugebauer 9019 Motion. ECF No. 242. According to the *Notice of Proposal*, the JIG counterproposal generally provided for a settlement of JIG's Claim No. 45, a payment of $6 million to the estate for the right to pursue estate causes of action, and the sale of the Debtor's rights in the name "GloriFi" for $100,000. *See id.* In response, on August 9, 2024, the Collateral Agent filed its *Notice of Constructive Termination of Settlement Agreement, Withdrawal of Request for Court Approval of Collateral Agent Settlement, and Final Proposal to Resolve All Issues Before the Court* (the "**WPI Termination Notice**"). ECF No. 252. In the WPI Termination Notice, the Collateral Agent provided notice of the "constructive termination" of the Neugebauer 9019 Motion and gave a final proposal to the Trustee. *Id.* The Collateral Agent's final proposal included the following: (1) as part of a Chapter 11 process, the Collateral Agent would make a credit bid of $20 million for ownership of all causes of action where it has a security interest; (2) the Collateral Agent would pay $750,000 to the estate ($500,000 of which would be used to pay estate administrative claims, and $250,000 would be reserved for distribution to creditors); (3) JIG would have an opportunity to match the $750,000 payment to the estate in exchange for ownership of estate claims against Mr. Neugebauer for breach of fiduciary duty; (4) the Collateral Agent would support the creation of a liquidating trust to prosecute the Collateral Agent's claims and the estate claims not purchased by the Collateral Agent or the JIG; and (5) the Collateral Agent would provide $3 million to jointly prosecute the claims. *Id.* at 6-8.

On August 12, 2024, the Trustee determined that JIG's proposal was the superior proposal for the estate and filed the Jackson 9019 Motion [ECF No. 258]. On August 15, 2024, the Court held the previously scheduled hearing on the Neugebauer 9019 Motion. ECF No. 263. At the

hearing, the Court denied the Neugebauer 9019 Motion as moot. *Id.* On August 19, 2024, the Court entered its *Order Denying Trustee's Motion for Approval of Compromise and Settlement Under Bankruptcy Rule 9019 with the Collateral Agent and with the Neugebauer Parties for Approval of Postpetition Financing* [ECF No. 269]. After the Debtor alerted the Court of its re-urging of the conversion to Chapter 11, the Court set an amendment deadline of August 26, 2024, for any possible amendments to the Motion to Convert. *See* ECF No. 263.

On August 26, 2024, the Debtor filed the current Motion to Convert. ECF No. 275. Attached to the Motion to Convert are the Debtor's Restructuring Support Agreement (the "**RSA**") [ECF No. 275-1], proposed Chapter 11 Plan [ECF No. 275-2], proposed Disclosure Statement [ECF No. 275-3], and a draft of the complaint from the Georgia Litigation [ECF No. 275-4]. The Court set both the Motion to Convert and the Jackson 9019 Motion for a concurrent hearing starting on September 23, 2024. The Court held seven days of trial and heard from twelve witnesses. After the hearing, the Court took the matters under advisement. The Court issued a preliminary oral bench ruling on December 6, 2024.

### III.   WITNESS TESTIMONY

During the seven days of the hearing, extensive testimony was elicited from a series of individuals called by the Debtor, the Collateral Agent, and the Trustee. The Court briefly summarizes that testimony as follows:

1. The Honorable Leif Clark, retired, testified as the Debtor's proposed Chief Restructuring Officer ("**CRO**"). Mr. Clark was a United States Bankruptcy Judge in the Western District of Texas and testified about his many years of experience and expertise in bankruptcy and restructuring law. Mr. Clark was new to the case, having been installed as CRO only about twenty days before the start of the hearing. For this reason, Mr. Clark had little factual

history of the Debtor to recount and was somewhat limited on his plans and expectations for a Chapter 11, including the role of the Collateral Agent, Mr. Neugebauer as CEO, and funding for the converted case. Although new to the case, Mr. Clark testified about what the Debtor proposed to do should the case be converted to Chapter 11. Mr. Clark testified that he would investigate all of the Debtor's causes of action to make sure that they are colorable. While Mr. Clark testified that he was not bound by the Debtor's RSA and proposed plan of reorganization, he testified that he would like to maintain the option to bring causes of action against the DEGA Defendants and sell causes of action against Mr. Neugebauer.

2. Caroline Lillard testified as a former communications manager of the Debtor who worked primarily out of Mr. Neugebauer's home while the Debtor was operational. Ms. Lillard testified that she did not witness anything inappropriate occurring during her time as an employee. Ms. Lillard also testified that she believes that Mr. Neugebauer did not create a hostile work environment, but that he could be "particular." She further testified that, as an equity holder, she supports the conversion of this case to Chapter 11.

3. Rodrigo Acuna testified as a former finance employee of the Debtor. Mr. Acuna was a Series 1 investor and also held equity in the company, in the way of founding shares, because he was an employee. Mr. Acuna never filed a proof of claim in the bankruptcy case. Mr. Acuna testified that he was tasked with reaching out to some financial institutions in New York to gauge interest in finding financial advisors for GloriFi and finding a Special Purpose Acquisition Company (a "**SPAC**") partner. Mr. Acuna testified that he identified a SPAC for GloriFi to merge with named DHC Acquisition Corp. ("**DHC**"). He testified that GloriFi never completed the merger. Mr. Acuna also generally testified as to his

11

understanding of the side letter with certain Series 1 noteholders and the alleged conversion of the Series 1 notes to equity. Finally, Mr. Acuna testified that, after leaving GloriFi, he started a tech company similar to that of a Debtor affiliate, Animo Financial Services, Inc., named Animo Services LLC, which provides financial services to members of the Hispanic community.

4. Josh Brummett testified as a former marketing employee of the Debtor. Like Ms. Lillard and Mr. Acuna, Mr. Brummet primarily worked out of Mr. Neugebauer's home. Mr. Brummett testified that it was normal for employees to work out of Mr. Neugebauer's Dallas home because it was the main office for the Debtor. He testified that Mr. Neugebauer had an intense management style but that he was a good and effective CEO. Mr. Brummett also testified about "Toby Tuesdays," which were meetings where all the staff in the area would come to Mr. Neugebauer's house on Tuesday evenings to give updates while socializing and enjoying libations.

5. Cathy Landtroop testified as the former Chief Marketing Officer of the Debtor. Ms. Landtroop was an Series 1 investor and equity holder in the company, and she testified that she supported conversion of this case to Chapter 11. Ms. Landtroop never filed a claim in the bankruptcy case. Ms. Landtroop testified about her experience at the company, including details about Mr. Neugebauer's habits during the workday and his leadership style. Ms. Landtroop also testified about working with Mr. Ayers and about his role in the company. She also testified about a meeting with Mr. Neugebauer and a former employee at P.F. Chang's, where an alleged altercation occurred between Mr. Neugebauer and the employee. Ms. Landtroop also discussed her thoughts about Coign, particularly as it relates to the similarity of its credit card design to that of the GloriFi credit card. Ms. Landtroop

also testified about the *Wall Street Journal* article and the potential sources of certain information given to the reporters. Finally, Ms. Landtroop also testified about the final days of the company and how Mr. Neugebauer began to blame everyone around him, including her, for the demise of GloriFi. She testified about a heated email that she wrote to Mr. Neugebauer in response to his claim that she was the reason for GloriFi's demise, in which she told Mr. Neugebauer all of the reasons why his actions lead to the end of the company. She testified that she no longer blamed Mr. Neugebauer for the company's demise.

6. Michael Ring testified as the President and CEO of Old Glory Bank, which is one of the Georgia Defendants. Mr. Ring testified that he had never heard of Mr. Neugebauer until his company got sued in the Georgia Litigation. He testified that Old Glory Bank never had any discussions with GloriFi and never had any connections with the Debtor's banking arm. Finally, Mr. Ring testified that he felt that Georgia Litigation (at least to his company) was frivolous, and that he drafted a Rule 11 letter in connection with the Georgia Litigation.

7. Charles Hamilton testified as a former board member and investor in the Debtor. Mr. Hamilton is both a Series 1 and Series 2 investor and testified that he supports conversion of this case to Chapter 11. Mr. Hamilton testified that he and Mr. Neugebauer have been friends and business partners for thirty years. Mr. Hamilton testified that he and Mr. Norwood were appointed to the board on Mr. Neugebauer's urging, which occurred after Keri Findley had been removed from the board. Mr. Hamilton testified generally about his time as a board member after being appointed to the board in early April 2022 until his departure in December 2022. Mr. Hamilton testified concerning particularly tumultuous exchanges between Mr. Neugebauer, Mr. Ayers, and Ms. Findley during the time when they were reviewing term sheets for the SPAC transaction capital raise. He testified that the

board had to conduct an independent investigation into Mr. Neugebauer because he was accused of misconduct. The independent investigation into the allegations was conducted by Locke Lord, LLP. Mr. Hamilton further testified that the investigation brought fundraising for the company to a halt.

8. Richard L. Jackson is the principal of JIG and the CEO of Jackson Healthcare. Mr. Jackson is a holder of a claim in the bankruptcy case, a Series 1 noteholder, and received a side letter from the company. Mr. Jackson testified that he is opposed to the conversion of this case to Chapter 11. Mr. Jackson also testified that he has a valid secured claim in this bankruptcy case because the Series 1 notes never converted to equity because the Series 2 issuance was allegedly in breach of a side letter a number of Series 1 investors received from the Debtor. Mr. Jackson is also one of the DEGA Defendants and a proponent of the Jackson Compromise. Mr. Jackson testified about his initial investment in GloriFi during the Series 1 round in the amount of $5 million and his purchase of Citadel's Series 1 debt, bringing his total investment to $10 million. Mr. Jackson also testified about why he was interested in acquiring the estate's causes of action, both during the original Trustee sale process and through the Jackson 9019 Motion. He also testified that the filing of the DEGA Litigation dissuaded him from participating in the Trustee's auction of the causes of action because it was then unclear to JIG what was being purchased. Mr. Jackson also testified that he felt that Mr. Neugebauer conducted a series of self-dealing transactions with the company. Finally, Mr. Jackson testified concerning the particularities of the Jackson 9019 Motion, his support for same, and his financial backing of the Jackson 9019 Motion.

9. J. Paul Manning testified as the sole member and manager of the Collateral Agent. Mr. Manning is both a Series 1 and Series 2 investor in GloriFi. Mr. Manning testified that he

and Mr. Neugebauer were childhood friends. Mr. Manning further testified that he created WPI Collateral Management, and it took over the role as collateral agent from OnPoint in the beginning of May 2024. Mr. Manning testified that he believes conversion is a better option for the Series 2 noteholders to be paid and he believes if the causes of action are true against the DEGA Defendants, then money can potentially go back to equity holders. Mr. Manning testified that he supports conversion because he believes it is the only way for him and other Series 2 noteholders to get a recovery. Mr. Manning also testified about the DIP funding that the Collateral Agent pledged to provide under the RSA. He noted that no funding is currently in place but that it could be raised within two days' notice should the case be converted to Chapter 11. Mr. Manning also testified that he is against the Jackson 9019 Motion because it completely ignores the secured creditors by allowing an unsecured creditor to take over the estate causes of action. Mr. Manning further testified that he filed the Georgia Litigation and the reasoning behind the filing. Specifically, Mr. Manning testified that one of the reasons behind filing the Georgia Litigation was to forestall the Trustee's sale of the causes of action, given that the DEGA Litigation was filed shortly after the Bid Procedures Order was entered by the Court. He also stated that he wants to see all of the estate causes of action prosecuted. Mr. Manning also testified that he believes the Collateral Agent's foreclosure on the Debtor's intellectual property to be proper, but admitted that he had issues with OnPoint's original foreclosure.

10. James Nicholas Ayers testified as a former board member of the Debtor and a DEGA Defendant. Mr. Ayers is also a Series 1 investor in GloriFi and filed a proof of claim in the bankruptcy. Mr. Ayers opposes the conversion of this case to Chapter 11 and supports the Jackson Compromise. Mr. Ayers testified about his complicated relationship with Mr.

15

Neugebauer and how he got involved with GloriFi. Mr. Ayers testified that he outlined his concerns about getting involved with the Debtor and how he and Mr. Neugebauer agreed to lay the groundwork for the company and then hire a professional C-Suite to run the business operations. Mr. Ayers further testified that everything was running smoothly at first but that in late December 2021/early January 2022 things started to go south when Mr. Neugebauer became increasingly erratic. Mr. Ayers also testified that while he had a role in fundraising early, he was not responsible for raising capital for the Series 2 round of investments. Mr. Ayers testified that and Ms. Findley, as board members, pushed back on Mr. Neugebauer's self-interested transactions and sought legal analysis from company counsel to ensure that the corporate governance surrounding the proposed term sheet was proper. He testified that after he asked for independent legal advice regarding the term sheets, Mr. Neugebauer strongly pushed back and that eventually he and Ms. Findley were removed from the Debtor's board of directors at the end of March and early April of 2022.

11. Toby Randolph Neugebauer testified as the founder and CEO of the Debtor. Mr. Neugebauer is a creditor of the estate, the majority shareholder of the Debtor, and the largest secured creditor of the Debtor. Mr. Neugebauer signed the Debtor's petition as its manager when it filed for bankruptcy. Mr. Neugebauer has paid the Debtor's legal fees in support of conversion to Chapter 11. Additionally, Mr. Neugebauer and the Collateral Agent are represented by the same set of attorneys. Mr. Neugebauer testified about his original vision for and dedication to the Debtor and about his time running the company at length. Further, Mr. Neugebauer testified about his own fundraising efforts relative to attempts to close the SPAC transaction with DHC. Mr. Neugebauer testified that he felt that Ms. Findley and Mr. Ayers undermined him and proposed a term sheet with DHC that

16

would remove him as CEO. He also testified that he felt that Mr. Ayers and Ms. Findley's request for an independent legal analysis of his proposed term sheet was unreasonable and that they just wanted to shift the risk to company counsel. He further testified that the term sheets that he proposed were not self-dealing because other investors had a chance to invest pro rata in the next round. Mr. Neugebauer also testified that Mr. Ayers was responsible for raising the capital needed to complete the DHC SPAC transaction and failed. He further testified why he felt that Mr. Ayers and Ms. Findley deserved to be removed from the Debtor's board of directors. Mr. Neugebauer also testified about the *Wall Street Journal* article, which he felt was one of the main causes of the demise of the Debtor. He testified that he tried to be transparent with the *Wall Street Journal* by providing the reporters with "every text and every email." Mr. Neugebauer further testified about the final days of the company and what he believed to be the ultimate demise of the Debtor leading to the bankruptcy filing. Likewise, he testified about the fact that it was his plan and desire to convert the case to Chapter 11. Mr. Neugebauer testified that he believes the best chance of recovery for the most amount of creditors is through the DEGA Litigation. Finally, Mr. Neugebauer testified about how he personally drummed up support for the RSA and why he felt that conversion was in the best interest of creditors. Mr. Neugebauer also testified about his role with the Debtor, should the case be converted to Chapter 11.

12. Scott Seidel, the duly appointed Chapter 7 Trustee, testified about his role and actions as the Chapter 7 trustee appointed to the Debtor's case. The Trustee testified about the actions that he has taken to try to monetize the estate's causes of action and why he chose to sell the causes of action rather than to litigate them himself. In particular, the Trustee testified that there are well-heeled parties on both sides of the litigation that would litigate for the

17

honor of it rather than settle the dispute, which would drive up litigation expenses. The Trustee testified that once the sale process did not go through, that he had to choose one storyline to pursue. The Trustee testified about what he did to investigate the different causes of action, including meeting with the various targets of potential litigation. The Trustee also testified about his opinion on the viability of the various claims and his understanding of the different sides of the dispute. The Trustee also testified that he believes that the Jackson 9019 Motion was the better route for creditors than converting the case to Chapter 11. In particular, in the Trustee's opinion, the Jackson Compromise brings more money into the estate, pays for all of the administrative expenses of the Chapter 7, and there is at least a minimum recovery for creditors of approximately \$4 million. He further testified about the Jackson 9019 Motion and the different intricacies of the Jackson Compromise.

## IV.   ANALYSIS

While the Court has two dueling motions that request seemingly differing relief, it does not face a binary decision between the Motion to Convert and the Jackson 9019 Motion. The denial of one of the motions does not guarantee the approval of the other motion. However, the Court purposely took up the Motion to Convert and the Jackson 9019 Motion together because each party confirmed early on that they would each use the existence of the countermotion as a defense.

Although a bit hyperbolic, the Court has described these motions as a "battle for the soul of the case" due to the unique circumstances surrounding the motions. It is important to note that these motions do not represent divergent views on how to best reorganize a company, nor divergent views on how to liquidate a company as there are no material, tangible assets to sell. Likewise, the

18

estate is cash poor.  Rather, these motions represent a battle on **who** should direct the litigation

decisions over the remaining assets of the company—the causes of action.

## THE MOTION TO CONVERT

The Court starts with the Debtor's Motion to Convert because it was the first in time of the

two motions, and the Debtor asserts that it has an *absolute* right under the Bankruptcy Code to

convert its case to Chapter 11.[3]

Section 706 of the Bankruptcy Code provides that:

(a) The debtor *may convert* under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title. Any waiver of the right to convert a case under this subsection is unenforceable.

(b) On request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time.

(c) The Court may not convert a case under this chapter to a case under chapter 12 or 13 of this title unless the debtor requests or consents to such a conversion.

(d) Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter.

11 U.S.C. § 706. Similar conditions for conversion are noted in 11 U.S.C. § 707(b)(1) as well. The

permissive language used in § 706 gives a bankruptcy court discretion to grant or deny such a

request. *See In re Zamora-Quezada*, 622 B.R. 865, 877 (Bankr. S.D. Tex. 2017).

Going back to 2007, the Supreme Court has confirmed that the right to convert a case is

not absolute. *See Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007). While

---

[3] The Debtor originally filed a motion to convert prior to the Jackson 9019 Motion on July 10, 2024. ECF No. 217. The Motion to Convert was later amended on August 26, 2024. ECF No. 275. The Collateral Agent filed its *Response in Support of and Joinder in Debtor's Amended Motion to Convert to Chapter 11 Pursuant to Section 706(a) of the Bankruptcy Code* on September 18, 2024. ECF No. 310. The Trustee filed his *Objection to Debtor's Motion to Convert Bankruptcy Case* on September 18, 2024. ECF No. 314. JIG filed its *Objection to Amended Motion to Convert Bankruptcy Case to Chapter 11 Pursuant to Section 706(a) of the Bankruptcy Code* on September 18, 2024. ECF No. 312. On September 18, 2024, the Ayers Parties filed their *Joinder to Trustee's Objection to Debtor's Amended Motion to Convert Bankruptcy Case to Chapter 11*. ECF No. 322.

*Marrama* involved a conversion from a Chapter 7 to a Chapter 13 instead of a Chapter 11, "a number of courts have found [*Marrama*] to be instructive or applicable to facts similar to [a Chapter 11 conversion]." *Dan Thomason & Assocs., LLC v. Breakwell*, No. 3-10-CV-00379-K, 2010 WL 3385025, at *1 (N.D. Tex. Aug. 25, 2010) (citing *In re FMO Assocs. II, LLC*, 402 B.R. 546, 550 (Bankr. E.D.N.Y. 2009); *In re George Love Farming, LC*, 366 B.R. 170, 177-78 (Bankr. D. Utah 2007); *In re Irmen*, No. 07-B-02103, 2008 WL 320484, at *3 (Bankr. N.D. Ill. Feb. 1, 2008); *In re 10 Bears at Chiloquin, Inc.,* No. 06-62079-FRA7, 2007 WL 1673538, at *2 (Bankr. D. Or. June 6, 2007); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 425 (Bankr. S.D.N.Y. 2007)).

In *Marrama*, the Supreme Court determined that "the words 'unless the debtor may be a debtor under such chapter' expressly conditioned [a debtor's] right to convert on his ability to qualify as a 'debtor.'" 549 U.S. at 372. Thus, a debtor must qualify as a debtor in Chapter 11 in order to be able to convert its case. *See id.* The Supreme Court reasoned that under § 1307(c), a proceeding under Chapter 13 could be dismissed or converted to a Chapter 7 proceeding "for cause," which the court interpreted to authorize dismissal or conversion for bad faith conduct. *Id.* at 373. Therefore, the Supreme Court reasoned that a debtor's bad faith could prevent it from qualifying as a debtor under Chapter 13. *Id.* at 373-375.

This same reasoning can apply to a Chapter 7 debtor's attempt to convert to Chapter 11. Under § 1112(b), "the court shall convert a case under [Chapter 11] to a case under [Chapter 7] … for cause." 11 U.S.C. § 1112(b). Thus, the Supreme Court determined that a debtor's bad faith conduct can be reason to deny conversion. See *Marrama*, 549 U.S. at 372-374.

In determining whether a debtor is eligible to be a Chapter 11 debtor, the bankruptcy court looks to § 1112(b)(1), which "governs when this Court must convert a Chapter 11 case to a Chapter

20

7 or dismiss the case." *In re Gow Ming Chao*, No. 11-38131, 2011 WL 5855276, at *6 (Bankr.

S.D. Tex. Nov. 21, 2011). Section 1112(b)(4) enumerates a nonexhaustive list of examples of what

constate "cause" to dismiss or convert:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
> (B) gross mismanagement of the estate;
> (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;
> (D) unauthorized use of cash collateral substantially harmful to one or more creditors
> (E) failure to comply with an order of the court;
> (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule appliable to a cause under this chapter;
> (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;
> (H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);
> (I) failure to timely pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief
> (J) failure to file a disclosure statement, or to file or confirm plan, within the fixed by this title or by order of the Court;
> (K) failure to pay any fees or charges required under Chapter 123 of title 28;
> (L) revocation of an order of confirmation under section 1114;
> (M) inability to effectuate substantial consummation of a confirmed plan;
> (N) material default by the debtor with respect to a confirmed plan
> (O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and
> (P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date filing of the petition.

11 U.S.C. § 1112(b)(4)(A)-(P).

Further, in *Marrama*, the Supreme Court held that, pursuant to § 105 of the Bankruptcy

Code, a bankruptcy court's authority "to take any action that is necessary or appropriate 'to prevent

an abuse of process' … is surely adequate to authorize an immediate denial of a motion to convert

filed under § 706 in lieu of a conversion order that merely postpones the allowance of equivalent

relief and may provide a debtor with an opportunity to take action prejudicial to creditors." 549

21

U.S. at 375. The Supreme Court also specifically noted that every federal court has the inherent power to sanction "abusive litigation tactics." *Id.* at 375-76; *see Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980).

Notwithstanding that the Supreme Court has not overruled *Marrama*, the Collateral Agent argues that in light of the Supreme Court's decision in *Law v. Seigel*, that this Court should follow the logic of the dissent in *Marrama*. *See* ECF No. 310, at ¶ 8. The *Marrama* dissent viewed § 706(a) as providing an absolute right to conversion, concluding that the application of Section 105(a) to vitiate that right would contravene the Code. 549 U.S. at 379 (Alito, J., dissenting). In *Law*, the Supreme Court considered whether bankruptcy courts could surcharge a debtor's statutorily exempt assets, despite provisions of the Code forbidding exemptions from being used as payment for administrative expenses. 571 U.S. 415, 420 (2014). The Supreme Court ruled that bankruptcy courts cannot violate the express terms of the Code by using their Section 105(a) powers to address bad faith. *Id.* at 421-22. However, in *Law*, the Supreme Court did not abrogate *Marrama*. *Id.* at 425-26. On the contrary, the Supreme Court distinguished *Marrama* and held that a debtor's bad faith actions could prevent it from qualifying as a debtor, which would satisfy § 706(d)'s express condition on conversion. *Id.* at 426. Therefore, the Court finds the Collateral Agent's reliance on the *Marrama* dissent wholly unpersuasive.

Since *Marrama*, courts have held that conversion may be denied if conversion would be futile, and cause would exist for reconversion. *See In re Daughtrey*, 896 F.3d 1255, 1276 (11th Cir. 2018) (holding that forcing a court to formally grant conversion before immediately dismissing or converting "would place form over substance and defy common sense"); *See also In re Kearney*, 625 B.R. 83, 97 (B.A.P. 10th Cir. 2021) ("Requiring a bankruptcy court to convert a Chapter 7 case to Chapter 13, only to thereafter dismiss the case or immediately return it to Chapter 7 would

be 'a procedural anomaly.'"). The Supreme Court confirms this reasoning in *Law*, stating that "in some circumstances a bankruptcy court may be authorized to dispense with futile procedural niceties in order to reach more expeditiously an end result required by the Code." 571 U.S. at 426.

In *Daughtery*, the Eleventh Circuit affirmed a bankruptcy court's decision that approved a proposed compromise between the Chapter 7 trustee and a judgment creditor and denied a pair of Chapter 7 debtors conversion to Chapter 11. 896 F.3d at 1259. In *Daughtrey*, the Chapter 7 trustee and the creditor entered into a compromise agreement that would sell the debtors' property, but, like the Debtor here, the *Daughtrey* debtors objected to the compromise agreement and moved to convert their case to Chapter 11. *Id.* at 1263-67. The bankruptcy court found that the debtors were "financially incapable of prosecuting a plan to confirmation and eventual consummation." *Id.* at 1278. The debtors did not have any cash on hand, any checking or savings accounts, or any other evidence of liquidity. *Id.* The court found that in order for the debtor to have a successful plan, there would need to be adversarial proceedings, and someone would have to step in and provide substantial funding. *Id.* The debtors also lacked an investor willing to finance the costs associated with the conversion. *Id.* The Eleventh Circuit affirmed the bankruptcy court's decision to deny confirmation because the debtor failed to demonstrate a reasonable likelihood of success under Chapter 11. *Id.* at 1279. The Eleventh Circuit also found that the filing of the motion to convert was just another step in the debtor's abuse of the bankruptcy process because the filing furthered the debtor's strategy to delay the process indefinitely. *Id.*

In *Kearney*, the Bankruptcy Appellate Panel for the Tenth Circuit (the "**10th Circuit BAP**") affirmed a bankruptcy court's decision denying a Chapter 11 debtor the right to convert a case under Chapter 7. 625 B.R. at 96. The debtor in *Kearney* attempted to convert his Chapter 11 case to one under Chapter 7, asserting that he had no assets to pay a criminal attorney. *Id.* at 91. The

bankruptcy court denied the motion to convert finding that the debtor was acting in bad faith and that the case would also be subject to immediate reconversion under section 706(b). *Id.* at 92. The 10th Circuit BAP followed the reasoning of *Marrama* and found that there is *no absolute right* to convert. *Id.* at 96. The 10th Circuit BAP further ruled that requiring a bankruptcy court convert a case to a different Chapter only to later reconvert the case to its original Chapter would constitute an unnecessary "procedural anomaly." *Id.* at 96-97.

In *Foster*, the District Court for the Northern District of Texas affirmed a bankruptcy court's decision to deny a debtor's motion to convert her case from Chapter 7 to Chapter 11. *In re Foster*, 530 B.R. 650, 655 (N.D. Tex. 2015). In *Foster*, the Debtor took inconsistent positions during the pendency of her bankruptcy case relative to the status of certain property. *Id.* at 651. The Debtor also had no ability to fund a plan. *Id.* at 652. The bankruptcy court also found that if a Chapter 11 Trustee were to be appointed, the work would largely duplicate what the Chapter 7 Trustee had already accomplished, and that the expenses related to conversion would be "incredibly burdensome" on the estate. *Id.* Based on these facts, the district court affirmed the bankruptcy court's denial of the debtor's attempt to convert her case from Chapter 7 to Chapter 11. *Id.* at 655.

In *NLG* the Bankruptcy Court for the District of Delaware denied a motion to convert an involuntary Chapter 7 case to a Chapter 11 case because the debtor lacked assets to repay its debts; there were grounds for immediate reconversion; it was unlikely that the debtor could confirm or consummate a plan; it was questionable whether any party in interest would benefit from conversion; and conversion would abuse the bankruptcy process. *In re NLG, LLC*, No. 21-11269 (JKS), 2023 WL 2053920, *7-10 (Bankr. D. Del. Feb. 16, 2023). In particular, the court found that the only assets of the estate sprang from potential litigation and that there were "no estate resources

24

to fund a Chapter 11 bankruptcy process, let alone pursue litigation." *Id.* at *8. The court further determined that the debtor would not have the funds available to pay (1) estate professionals, (2) the quarterly trustee fees, or (3) any costs to administer the estate. *Id.* The *NLG* court also determined that converting the case to Chapter 11 "to obtain tactical litigation advantages is not within the legitimate scope of bankruptcy laws and would be an abuse of the bankruptcy process." *Id.* at *10.

Here, the evidence showed a smattering of what the Court would consider both bad faith and abuse of process. The Trustee alleges that Mr. Neugebauer has engaged in prepetition and post-petition bad faith, among other things. For example, the Trustee argues that the Debtor violated Blue Sky laws and improperly solicited a plan. ECF No. 314. As discussed further below, while the Court finds that some of the actions taken by the Debtor's principal, Mr. Neugebauer, post-petition may be indicative of bad faith conduct, it declines to use Mr. Neugebauer's prepetition actions relative to the Debtor's downfall as "cause" to prevent conversion because the Court does not want to arguably create any collateral estoppel effect for future litigation with bad faith findings. Nevertheless, under the totality of the circumstances, the Court finds that conversion to Chapter 11 would be inappropriate because cause would exist to reconvert the case.

## A. ABUSE OF PROCESS

As stated above, in *Marrama*, the Supreme Court held that a bankruptcy court has the authority to deny conversion to another Chapter pursuant to § 105 of the Bankruptcy Code if the conversion would constitute an abuse of process. *Marrama*, 549 U.S. at 375. Therefore, the Court must determine whether conversion would constitute an abuse of the bankruptcy process in this case. The facts and procedural history of this case are important. The Debtor chose to file its case voluntarily under Chapter 7 of the Bankruptcy Code. The Debtor then decided that it was time to

25

convert the case to Chapter 11 over eighteen months after the filing of the case. To say that the amount of time between the filing and the Motion to Convert is unusually long would be an understatement. Like the court in *Daughtrey*, the Court finds that converting this case to Chapter 11 would further delay this case with no clear resolution in sight. *See Daughtrey*, 896 F.3d at 1279.

Likewise, the Court finds that the Motion to Convert was filed to exact a litigation advantage in the bankruptcy, which constitutes an abuse of the bankruptcy process. *See NLG*, 2023 WL 2053920, at *10 (holding that converting a case to obtain tactical litigation advantages is an abuse of the bankruptcy process). The DEGA Litigation was knowingly and specifically filed to stop the sale of the estate causes of action. Mr. Manning testified candidly that one of the reasons that the Collateral Agent filed the DEGA Litigation was to impact the Trustee's impending auction of the estate's causes of action. ECF No. 361, at 41-42. While the Court does not take a position regarding whether the plaintiffs in the DEGA Litigation violated the automatic stay by filing, it does find that the timing of the filing of the DEGA Litigation was to intentionally disrupt the Trustee's auction process and cause disarray into who owns certain causes of action, which ultimately led to the auction never occurring. The Court finds that deliberately interfering with the Trustee's attempts to sell the estate property constitutes an abuse of process.

The Trustee filed the Adversary Proceeding in response to the DEGA Litigation. The Motion to Convert was filed only *after* the Trustee filed the Adversary Proceeding. There is no question that the Motion to Convert was filed as a litigation tactic to prevent the Adversary Proceeding from taking place. In fact, the Debtor's proposed plan seeks to dismiss the Adversary Proceeding with prejudice. ECF No. 326-3, at § 7.2.

Additionally, the Motion to Convert suffers from serious due process issues. Despite repeatedly touting overwhelming creditor support, the Debtor did not properly serve the Motion

26

to Convert and the notice of hearing on all of the Debtor's creditors at least 21 days prior to the first day of the hearing. Under Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), "the clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by mail of … the hearing on the dismissal of the case or the conversion of the case to another Chapter." FED. R. BANKR. P. 2002(a)(4). The certificate of service included with the Motion to Convert states that "a true and correct copy of the foregoing document was served on all parties consenting to electronic service of this case via the Court's ECF System for the Northern District of Texas." ECF No. 275, at 14. Serving only those parties that consent to ECF Service omits a substantial number of creditors who filed proofs of claim but did not appear by counsel in the bankruptcy case.[4]

At the hearing on September 23, 2024, the Trustee orally moved the Court to not go forward with the Motion to Convert because of the lack of proper service. ECF No. 352, at 11-12. The Court ruled that the hearing would still go forward despite the serious service issues with respect to the Motion to Convert. *Id.* at 28. The Court further ruled that although the hearing was going forward, the Court would restrict the Debtor from introducing any evidence that the Motion to Convert had significant support pursuant to section 105 of the Bankruptcy Code and Federal Rule of Evidence 403, given that there were a significant number of creditors (at least 42 out of the 60 filed claimants by the Trustee's estimation) who were not properly served. *Id.*[5]

In the Motion to Convert, the Debtor repeatedly claims that it received "support for conversion from all secured creditors and a significant portion of unsecured creditors. However,

---

[4] In an attempt to remedy this error, the Debtor filed a *Supplemental Certificate of Service* [ECF No. 325] stating that creditors were served the Motion to Convert and the notice of hearing "via Federal Express Priority Overnight and/or Express Mail delivery on September 19, 2024[,]" which was a mere four days prior to the start of the hearing.
[5] Further, the Court ruled that should the Motion to Convert be granted, it would be on negative notice to allow the missing creditors an opportunity to be heard.

the Court only has evidence of support for the conversion from Mr. Neugebauer and his related

entities, the Collateral Agent, Mr. Acuna, Ms. Lillard, and Mr. Blankenship on behalf of Winston

& Strawn. Additionally, Lynwood Partners LLC,[6] Matthew Malouf,[7] Charles Hamilton[8] all filed

joinders in the Motion to Convert, evidencing their support for conversion of the case to Chapter

11. It cannot be lost that most, if not all, of these individuals: (1) are insiders; (2) former insiders

of the Debtor; (3) not creditors; or individuals or entities that formed the basis for their opinion on

a flawed description of what Chapter 11 would entail. For example, Ms. Lillard, who is not a

creditor and only has an equity stake in the Debtor, testified that she would like to see this case

converted from Chapter 7 to Chapter 11 because she "trust[s] Toby" and believes that what "he's

trying to do is in the best interest of the former employees and shareholders." ECF No. 352, at 181.

There is no estimation of a recovery for equity.

Even then, there is evidence that some creditor support for the Debtor's proposed Chapter

11 plan and the RSA was procured through misunderstanding, at best, and misinformation, at

worst. According to Mr. Blankenship's deposition testimony, he believed that the conversion

contemplated in this case was a way to *restructure* the company in a Chapter 11 so that the

company could emerge post-bankruptcy.[9] Mr. Blankenship also repeatedly testified that his

decision to support conversion was based on his *general* belief that Chapter 11 is more favorable

than Chapter 7. *See id.* at 85 & 117. It is clear from Mr. Blankenship's testimony that, at the very

least, he had a misunderstanding of what the proposed conversion to Chapter 11 would entail in

this case. There was never a plan to rehabilitate or reorganize the Debtor. *See* ECF Nos. 326-2 &

---

[6] ECF No. 303.

[7] ECF No. 305.

[8] ECF No. 307. Lynwood Partners, Mr. Malouf, and Mr. Hamilton are each Series 2 Noteholders, represented by the same counsel, and filed virtually identical joinders. None of these creditors pursued the joinders independently during the hearing.

[9] Transcript of Deposition Designation for Michael Blakenship dated September 9, 2024, at pp. 85-86.

326-3. Additionally, Mr. Neugebauer testified that Mr. Blankenship "took calls" from other creditors to show his support for the RSA. ECF No. 349, at 85; ECF No. 361, at 244. This demonstrates that at least other creditors (unnamed as they may be) had misinformation regarding the general purpose of the Motion to Convert and the Debtor's proposed plan and RSA.

The RSA is supported mainly by insiders or potential creditors who would benefit from conversion of the Series 1 notes to equity and does not include many of the Series 1 noteholders or unsecured creditors. *See* ECF No. 326-2. Additionally, many of the alleged creditors that signed on to the RSA did not file a proof of claim and are therefore not creditors in the Chapter 7 case. For example, the following alleged unsecured creditors signed the RSA but did not file proofs of claim, timely or otherwise: (1) Jackson Walker; (2) Relentless Strategies; (3) Matic Digital; (4) EP Revolution Pictures; (5) Slate Group; (6) TransPecos Bank; and (7) Chapman and Cutler LLP. *See id.* In total, there are only four non-insider unsecured creditors who filed claims who have unconditionally signed the RSA, including: (1) Winston & Strawn [Claim 15-1]; (2) Red Leader [Claim 35-1]; (3) Walnut Creek Advisors [Claim 24-1]; and (4) Collective Dallas [Claim 20-1]. *See id.*[10] The rest of the creditors who signed the RSA are Series 2 noteholders, who allege they are secured creditors and would benefit from the conversion of the Series 1 notes to equity. Therefore, the Court does not have the evidentiary support that unsecured creditors generally support the conversion to Chapter 11.

Finally, as alluded to above, the purpose of conversion would merely be to liquidate the estate. The Supreme Court has identified two basic purposes of Chapter 11: (1) preserving the going concern value of debtor's business and (2) maximizing property available to satisfy creditor

---

[10] Savana, Inc. conditionally signed the RSA and noted that it "is inclined to support the proposed restructuring, but will need to see final documents… before offering a final commitment." ECF No. 362-2, at 9.

claims. *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453; *see also In re Integrated Telecom Express, Inc.*, 549 U.S. 108, 119 (3d Cir. 2003). Like the Debtor in *NLG*, the Debtor is unquestionably not an operating business, does not have any source of income or liquid assts; therefore, it has no going concern value to preserve in Chapter 11 through reorganization. *See NLG*, 2023 WL 2053920, at *10. Courts have found that conversion to Chapter 11 is inappropriate when the only purpose is to liquidate rather than reorganize. *See id.*; *see also Dan Thomason*, 2010 WL 3385025, at *2. Furthermore, converting this case to Chapter 11 simply to obtain a tactical litigation advantage is not within the legitimate scope of bankruptcy laws and would be an abuse of the bankruptcy process. As the Supreme Court ruled in *Marrama*, section 105(a) of the Bankruptcy Code authorizes the Court to prevent this kind of abuse of the bankruptcy system by denying the Motion to Convert. *See* 549 U.S. at 375.

### B. BAD FAITH

In *Marrama*, the Supreme Court determined that a debtor's bad faith conduct can be used as a reason to deny conversion. 549 U.S. at 372-74. The Trustee has alleged a variety of what he has called bad faith acts in this case. *See* ECF No. 314. While the Court declines to use Mr. Neugebauer's prepetition actions as cause to convert, the Court cannot ignore the vast amount of evidence of what led GloriFi into bankruptcy, especially as a guide into the psyche of Mr. Neugebauer and his desire to control the Debtor at all costs.

It is clear to the Court, based on the evidence, that Mr. Neugebauer is a very charming, intelligent, big picture thinker who can persuade people to follow his vision. Mr. Neugebauer is also extremely energetic and impetuous. The evidence shows that Mr. Neugebauer has a propensity to demand singular control when he believes that his path is the right one, and he will quickly set out to remove decisionmakers who stand in his way. Both adverse parties and compatriots testified

that Mr. Neugebauer "sees black helicopters," meaning that sometimes he sees things that are not there, specifically that everyone is against him. *See* ECF No. 348, at 81. When plagued by this mindset, Mr. Neugebauer's actions are more impetuous and overly dramatic.

Underpinning this Chapter 7 bankruptcy case is a dispute as to which persons or entities were responsible for the demise of the Debtor which, at one point, was allegedly worth in excess of $1.6 billion. The Ayers Parties/JIG argue that Mr. Neugebauer mismanaged the Debtor, attempted to obtain the business (or valuable parts of it) for himself, and otherwise drove GloriFi into the ground due in part to hubris, culminating in a *Wall Street Journal* article on October 13, 2022, that was unfavorable to the Debtor (and Mr. Neugebauer in particular). *See* ECF No. 329-53. The *Wall Street Journal* article made it very difficult, if not impossible, for the Debtor to continue raising the funds that were needed to bring the Debtor's financial services products to market. For instance, Mr. Ayers testified that he had concerns about Mr. Neugebauer's manic communication style and the amount of alcohol Mr. Neugebauer consumed. ECF No. 356, at 200. Ms. Landtroop, for example, testified that she regularly saw him "microdose" alcohol throughout the day by throwing a splash of "rum in a Red Bull or in a Diet Coke." ECF No. 352, at 265. Ms. Landtroop also testified that there was at least one phone call with investors after the publication of the negative *Wall Street Journal* article where Mr. Neugebauer was not lucid and was overly emotional throughout. ECF No. 349, at 27.

Further, the Ayers Parties/JIG allege that Mr. Neugebauer disregarded corporate formalities, engaged in self-dealing, and had an unyielding desire not to lose control. Mr. Ayers testified that Mr. Neugebauer would call last-minute board and investor meetings. He also testified that Mr. Neugebauer refused to let company attorneys provide independent legal analysis of various proposed term sheets to board members before there was a board vote. *See* ECF No. 348,

at 179. Mr. Ayers also testified that after he and Ms. Findley refused to vote the way that Mr. Neugebauer wanted, he removed them from the board. *See* ECF No. 356, at 163 & 170.

On the other hand, Mr. Neugebauer and the Collateral Agent counter these allegations by claiming that while Mr. Neugebauer was eccentric, he was singularly driven to make GloriFi succeed. They argue that when his co-founders and co-investors were unable or unwilling to raise the money needed for the SPAC transaction, he put his and his family's money on the line to help the company succeed. Mr. Neugebauer testified that he did not engage in self-interested transactions. Rather, his proposals were evidence of his singular commitment to the company and that he gave parties the opportunity to invest pro rata. ECF No. 361, at 203.

Mr. Neugebauer and the Collateral Agent also assert that various wealthy, early investors allegedly conspired to steal the Debtor's trade secrets and intellectual property and to start competing businesses, also breaching their fiduciary duties to the Debtor.[11] These allegations form the basis of the DEGA Litigation. Against this backdrop, the Court will explain its reasoning that if the Debtor's case were converted to Chapter 11, cause for reconversion would exist.

## C. CAUSE FOR RECONVERSION

As in *Daughtrey*, the Court is faced with a decision of whether to convert a Chapter 7 case to Chapter 11 or approve a Bankruptcy Rule 9019 settlement agreement proposed by the Chapter 7 Trustee. *See* 896 F.3d at 1259. This case shares striking similarities with the *Daughtrey* case. Here, the Court finds that it is in the best interest of creditors to deny the conversion to Chapter 11

---

[11] For instance, Ms. Landtroop testified that Coign, a conservative credit card company, "looked eerily familiar" to what GloriFi was building. ECF No. 352, at 325. In particular, Ms. Landtroop testified that Coign seemed to have copied her design of a "We the People" credit card. *Id.* at 326-27. Mr. Neugebauer also testified that Mr. Ramaswamy took his idea to start a conservative counterpoint to Black Rock, specializing in ETFs, when he started Strive. *See* ECF No. 361, at 175-177.

because this case would be ripe for reconversion. 11 U.S.C. § 1112; *Daughtrey*, 896 F.3d at 1279-80; *Kearney*, 625 B.R. at 96-97; *Foster*, 530 B.R. at 654; *NLG*, 2023 WL 2053920, at *8. Although the Debtor outlined its proposal for a Chapter 11 plan in its Motion to Convert, the Court finds that conversion to Chapter 11 would be futile for a myriad of reasons.

First, the United States Trustee indicated on the record that she intends to seek the appointment of a Chapter 11 trustee if the case is converted. ECF No. 328-8; ECF No. 371, at 135. If a Chapter 11 trustee were to be appointed, their work would be largely duplicative of what the Trustee in this case has already tried. *See Foster*, 530 B.R. at 652 (finding that a potential Chapter 11 trustee's work would largely duplicate the work of the Chapter 7 trustee and create an incredibly burdensome expense for the estate). Furthermore, the appointment of a Chapter 11 trustee would increase the administrative expenses on the estate because the estate would be responsible for paying for the duplicative work by Debtor's counsel and the Chapter 7 Trustee as the CRO, and the Debtor would be retreading the same ground.

Second, the Court finds that there are a multitude of conflicts of interests that exist in this case, which the Court finds very concerning. After days and days of testimony, the Court is flatly unconvinced that Mr. Neugebauer is not "the man behind the curtain" in this bankruptcy case. Mr. Neugebauer is the CEO of the Debtor, the largest equity holder, a potential litigation target, and the largest holder of Series 2 notes, meaning that he has the most to gain should the case be converted. Mr. Neugebauer and Mr. Manning (the sole member and manager of the Collateral Agent) have been lifelong friends and have known each other since they were teenagers. *See* ECF No. 361, at 9. Additionally, the Bonds Ellis law firm has represented Mr. Neugebauer, the Collateral Agent, *and* the Debtor at some point during this case, and currently Bonds Ellis and the Texas Trial Group represent both Mr. Neugebauer and the Collateral Agent in this action. More

33

importantly, at one point in this case, Mr. Neugebauer and the Debtor disputed the legitimacy of the Collateral Agent's predecessor's foreclosure on the Debtor's assets (although Mr. Neugebauer claims to no longer dispute the foreclosure). *See* ECF No. 175; *see also* ECF No. 9, at 36-37.

Mr. Neugebauer has been the primary decision maker of the Debtor while being a potential litigation target. Mr. Neugebauer has also been responsible for paying for the Debtor's legal fees. Mr. Neugebauer testified that ***he*** came up with the idea of converting the case to Chapter 11 during one of his late-night brainstorming sessions. ECF No. 349, at 95-96. Mr. Neugebauer also testified that he was heavily involved in the preparation of the documents for conversion. *Id.* at 91.  Once the Debtor determined that it would like to convert its case to Chapter 11, Mr. Neugebauer was the primary mouthpiece drumming up support for conversion. Mr. Neugebauer testified that he spent his Fourth of July weekend calling creditors from the Debtor's schedules to get support for the conversion and the RSA. *Id.* at 89-91. Overall, the Court has concerns with the number of conflicts that exist between Mr. Neugebauer, the Debtor, and the Collateral Agent. In particular, the Court is concerned with the amount of influence that Mr. Neugebauer has over the Debtor and the Collateral Agent given his status as both a secured creditor, an unsecured creditor and a potential litigation target.

The Debtor attempts to alleviate the Court's concerns with the numerous conflicts in this case by hiring Mr. Clark, a retired bankruptcy judge, as the Debtor's CRO. Although hiring a CRO, in general, certainly helps alleviate some of the Court's conflict concerns, it does not get the Debtor across the finish line under these facts. The Court does not question Mr. Clark's qualifications. Mr. Clark is a highly respected jurist who served for twenty-five years, taught bankruptcy law at the University of Texas, served as a mediator and expert witness in several cases, and currently serves

34

as a trustee for a litigation trust created pursuant to a Chapter 11 plan. ECF No. 352, at 88-89. Mr. Clark has an immense amount of experience and is unquestionably qualified to serve as a CRO.

However, Mr. Clark's insertion in this case was of very recent vintage[12], and it was apparent to the Court that he was learning new facts about the Debtor, its history, the Collateral Agent, and Mr. Neugebauer *during* the hearing. The Court is also concerned about Mr. Neugebauer's influence over the Debtor's board of directors despite Mr. Clark being on the board. Mr. Neugebauer has a long history of leaving and returning to management and removing board members and decision makers with whom he disagrees from power. In an effort to resolve the Court's concerns, post-hearing, Mr. Neugebauer agreed to resign as President and a director of the Debtor effective immediately upon conversion of the Debtor's bankruptcy case from Chapter 7 to Chapter 11. ECF No. 362. Again, this only addresses one conflict.

The Court is also concerned with the feasibility of the proposed plan and the logistics of conversion to Chapter 11. The Court finds that the only assets of the estate spring from potential litigation and that there are no estate resources to fund a Chapter 11 process, let alone pursue litigation. *See NLG*, 2023 WL 2053920, at *8 (finding that the debtor had no assets besides potential litigation recovery and that there were no resources to fund a potential Chapter 11 process). Under the RSA, WPI Collateral Management, the Collateral Agent, has agreed to provide a debtor-in-possession facility (the "**DIP Facility**") in the amount of $2 million should this case convert to Chapter 11. ECF No. 326-2, at 3. The Collateral Agent currently does not have the money together to fund the DIP Facility. Mr. Manning testified that although the Collateral Agent has a significant amount of the money in its account, the entirety of the $2 million was not in the

---

[12]  Mr. Clark's engagement as CRO became effective as of September 3, 2024. ECF No. 326-13. The first day of the hearing for this matter occurred on September 23, 2024. ECF No. 342. Therefore, Mr. Clark had about 20 days to learn the complicated procedural and factual history of this case before the start of the hearing.

Collateral Agent's possession. ECF No. 361, at 64. Even if the DIP Facility were fully funded, the Court finds that $2 million is not enough to pay off Chapter 7 expenses, pay quarterly fees, fund Chapter 11 expenses, investigate liens, and confirm the Chapter 11 case given the documented historical contentious nature of this case.

Further, the Debtor has not provided any evidence of any other funding that it could use to fund the potential Chapter 11 case. The only funding that the Debtor has is from the Collateral Agent, whose liens are currently subject to attack in the Adversary Proceeding, or would, at a minimum, have to be investigated by the CRO. There is a risk that the Collateral Agent's liens are invalidated, which would severely harm the potential funding of the DIP facility. Additionally, there is no back-end money to fund the actual litigation if the case is converted. While Mr. Clark testified that he would look for litigation financiers, the Trustee testified that he looked for contingency counsel and litigation financing to no avail because the litigation funders were unwilling to participate due to the "amounts involved and the question with regard to who owns what claims and liens." ECF No. 370, at 27. Likewise, given many of the DEGA Defendants are billionaires with resources to defend themselves, funding would have to be considerable.

Likewise, conversion to Chapter 11 would delay the whole process of litigating the estate's causes of action. It is important to note that certain causes of action are running up against statute of limitations deadlines, and any further delay may cause those causes of action to expire. Converting the case would insert a new fiduciary who would be starting the work from ground zero. As the Court noted above, the Debtor's proposed CRO, Mr. Clark, is new to this case and would have a lot of catching up to do in a short amount of time to get up to speed to litigate these causes of action. Further, if the Court were to appoint a Chapter 11 trustee upon conversion, the Chapter 11 trustee would be put in the exact same position as the Chapter 7 Trustee in this case,

36

thus causing further delay. Further, Mr. Clark candidly testified that if the case were converted he would consider either selling, settling, or litigating the estate's causes of action. ECF No. 352, at 97-98. Essentially, the conversion to Chapter 11 would retread the *exact* actions that the Trustee has already tried or is already doing in this case.

The only true difference between the actions the Trustee has taken in this case and the Debtor's proposed actions upon conversion is that the Debtor promises to litigate the causes of actions, which there is not sufficient money to do under its proposed plan. *See* ECF 326-3, at 16. The Debtor also proposes to sell the causes of action against Mr. Neugebauer for $4 million, but there is no back-stop guaranteeing that the causes of action will be sold. *See* ECF No. 326-2, at 5. The Trustee credibly testified that two-headed litigation against both sides of the same facts would harm the value of the claims in both cases, and so it was better to choose one side. *See* ECF No. 370, at 41-43.

Based upon these facts, the Court finds that at least two section 1112(b)(4) "causes" exist for denying conversion to chapter 11: "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," and "inability to effectuate substantial consummation of a confirmed plan." 11 U.S.C. § 112(b)(4)(A), (M); *see, e.g., NLG*, 2023 WL 2053920, at *8. First, there is continuing loss to an estate that is already insolvent because the Debtor has incurred substantial administrative expense claims in the Chapter 7 case for which the estate has no current funds to pay. Additionally, the potential conversion to Chapter 11 would be extremely expensive, further adding to the loss and diminution of the estate. Second, there are insufficient funds to administer a Chapter 11 case (given the historical contentious nature of this case) and consummate a feasible plan. Therefore, the Court finds that there would be immediate grounds for reconversion should the case convert to Chapter 11. As such, the court will not go

through the "procedural anomaly" of converting this case to Chapter 11 just to immediately convert it back to Chapter 7 but will instead deny the motion to convert. *See Kearney*, 625 B.R. at 97.

The Court does not decide cases in a vacuum. After seven days of trial, the Court has heard the arguments from every side possible. The Court is convinced that reconversion will create rather than resolve numerous bankruptcy issues and create even more bankruptcy-related litigation that does not result in money flowing *into* the estate. To be certain, conversion to Chapter 11 is a ticket to further litigation. The Court has already seen that show, and it is not in the best interest of creditors to go down this route afresh. To force the Court to waste the time and money of a cash-strapped estate, holding nothing but causes of actions with expiring statutes of limitations, is not logical, advisable, or required by the Bankruptcy Code. The Court sees no reasonable avenue for a tangible benefit to creditors from conversion and finds cause would exist to convert from Chapter 11 back to Chapter 7 pursuant to Section 1112. Likewise, if prepetition history is a guide, the Motion to Convert is an attempt by Mr. Neugebauer to control the Debtor, which he voluntarily put into Chapter 7. The Motion to Convert is a thinly-disguised motion to remove the Trustee. There is no purpose to Chapter 11, only a change of control. After eighteen months in Chapter 7 and numerous litigation tactics, which the Court finds to be a collective abuse of the bankruptcy process, the Court finds that conversion would be improper. Thus, the Motion to Convert will be **DENIED**.

### THE JACKSON 9019 MOTION

#### A.    THE JACKSON COMPROMISE.

The Court will turn to the Jackson 9019 Motion. ECF No. 258. The Jackson Compromise can be fairly summarized as follows, in pertinent part:

- The Adversary Proceeding and the objections to the Lift Stay Motions and the Motion to Convert will be pursued by the Trustee.

- GloriFi Acquisitions, LLC (the **"Agent"**), a newly created entity with financial backing from JIG or affiliates thereof, will pay $6 million to the estate. From litigation proceeds, the Agent will receive a distribution preference in the amount of (i) $6 million, plus (ii) advanced Special Counsel Fees, plus (iii) 1% per month return on the outstanding balance of (i) and (ii), compounded monthly (collectively, the **"Preference"**). A waterfall divides remaining litigation proceeds between the Agent and the estate, as follows:

| UNENCUMBERED NET PROCEEDS[13] | AGENT | ESTATE |
|---|---|---|
| Up to Preference | 100% | 0% |
| Preference to $30M | 80% | 20% |
| $30M to $50M | 50% | 50% |
| $50M to $60M | 40% | 60% |
| Over $60M | 20% | 80% |

The obligations owing to the Agent under the Agreement will be secured by (a) first priority lien and security interest in all of the Unencumbered Net Proceeds, and (b) a second priority lien and security interests in all of encumbered net proceeds.

- The Agent will pay $100,000 to the estate to purchase, as-is where-is, the Debtor's and the estate's rights in the name "GloriFi" and equity in any subsidiaries.

- The Agent and the Trustee will enter into the Joint Prosecution Agreement (the **"Joint Prosecution Agreement"** or **"JPA"**), under which the Agent has primary discretion to litigate estate claims and manage and control the same, subject to certain controls retained by the Trustee. Specifically, Section 21 of the Agreement provides that: "Subject only to the major decisions described below, Agent shall have sole authority to prosecute, not

---

[13] **"Unencumbered Net Proceeds"** is defined as: (a) the proceeds obtained from (a) causes of action owned by the estate (**"Estate Causes of Action"**) pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code, (b) Estate Causes of Action for breach of fiduciary duty including similar and related claims, (c) Estate Causes of Action for malpractice, (d) Estate Causes of Action for commercial torts unless such commercial tort claim is determined by the Bankruptcy Court to be the subject of a valid and perfected lien or security interest as of the Petition Date, and (e) any other Estate Causes of Action that are not encumbered (collectively, the **"Unencumbered Estate Causes of Action"**); (b) the proceeds from any other asset of the estate that is not subject to a valid and perfected lien or security interest as of the Petition Date; and (c) any other amounts that the estate is entitled to distribute to general unsecured creditors. ECF No. 258-1, ¶ 15.

prosecute, negotiate, settle or otherwise dispose or not dispose of the Estate Causes of Action. No other party shall be entitled to assert any Estate Causes of Action, as such sole authority over Estate Causes of Action is vested in the Agent."[14] ECF No. 258-1, ¶ 21. The Agent will have the authority to select counsel (**"Special Counsel"**) to pursue the Estate of Causes of Action, but the Trustee will retain them. *Id.* at ¶ 25. Special Counsel Fees[15] will be paid from the Unencumbered Net Proceeds and not the $6 million payment.

- The Agent will have joint standing to participate in the prosecution or defense, as applicable, of the above matters, and that in the event there is any dispute between the Agent and Trustee in the prosecution or defense, as applicable, of the above matters, the Agent will assume the prosecution or defense of such matters. *Id.* at ¶ 29.

- The parties agree to seek permanent stay or dismissal of the DEGA Litigation.

- No specific third-party releases are given, and no causes of action are being sold pursuant to the terms of the 9019 Motion; provided however, the Trustee is selling to the Agent, pursuant to Section 363 of the Bankruptcy Code, all of the Debtor's and the estate's rights given to the Agent under the Agreement.

- Claim No. 45 belonging to JIG will be allowed in the amount of $10 million, but without issue preclusion concerning the allowance of other Series 1 noteholder claims or concerning the allowance of any Series 2 noteholder claims. *Id.* at ¶ 40.

B.     LEGAL STANDARD FOR A COMPROMISE PURSUANT TO BANKRUPTCY RULE 9019.

Pursuant to Bankruptcy Rule 9019(a), the Court may approve a compromise and settlement

of claims held by the bankruptcy estate. FED. R. BANKR. P. 9019(a); *Conn. Gen. Life Ins. Co. v.*

---

[14] The JPA vests discretion and authority to prosecute the Estate Causes of Action in the Agent; *provided, however*, that any settlement of an Estate Causes of Action in an amount of more than $5 million shall be subject to Bankruptcy Court approval, if required by the terms of such settlement. For the avoidance of doubt, the Trustee acknowledges that the Agent will be empowered and entitled to bring suit for Estate Causes of Action in the name of and on behalf of Trustee and will be further empowered to add the Trustee as a party to existing litigation or substitute the Trustee as a party to existing litigation. In the event the Agent is grossly negligent in the prosecution of Estate Causes of Action, the Trustee may seek relief from the Court. Major decisions require the Trustee's approval, which approval will not be unreasonably withheld. Major decisions are limited to non-suiting, dismissing, or settling Estate Causes of Action. For the avoidance of doubt, at a minimum, Agent will file suit asserting breach of fiduciary duty claims against Toby Neugebauer; the failure to file such claims will be deemed gross negligence under this Agreement and will constitute a default by Agent under this Agreement. ECF No. 258-1, ¶ 23.

[15] **"Special Counsel Fees"** is defined as fees incurred by Special Counsel in pursuit of the litigation pursuant to the Joint Prosecution Agreement, and fees, costs and expenses incurred by Agent's counsel in pursuit of the litigation pursuant to the same. ECF No. 258-1, ¶ 34.

*United Cos. Fin. Corp. (In re Foster Mortgage Co.)*, 68 F.3d 914, 917 (5th Cir. 1995). Compromises are "desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citation omitted). The burden is on the Trustee, but he need only show that a compromise falls within the "range of reasonable litigation alternatives." *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)). Approval of a compromise lies within the sound discretion of the bankruptcy court. *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984) ("The decision of whether to approve a particular compromise lies within the discretion of the trial judge; an appellate court will reverse only when that discretion has been abused.") (citing *Jackson Brewing*, 624 F.2d at 602-03)). To assure a proper compromise, the bankruptcy judge must be apprised of all necessary facts for an intelligent, objective, and educated evaluation. *Jackson Brewing*, 624 F.2d at 605. There are two general standards against which a proposed compromise and settlement is to be assessed by the bankruptcy court: (1) whether the agreement is "fair and equitable," and (2) whether the agreement is "in the best interests of the estate." *See In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

In determining whether a settlement is fair and equitable, the Fifth Circuit has articulated five factors for courts to consider: (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, including the difficulties, if any, to be encountered in the matter of collection; (3) the paramount interest of the creditors with a proper deference to their reasonable views; (4) the extent to which the settlement is truly the product of

41

arms-length bargaining and not fraud or collusion; and (5) all other factors bearing on the wisdom of the compromise.[16] Notably, Bankruptcy Rule 9019 does not require a bankruptcy judge to hold a full evidentiary hearing, or even a "mini-trial" before a compromise can be approved. *In re Cajun Elec. Power Coop.*, 119 F.3d 349, 355–56 (5th Cir. 1997). Rather than being forced to decide all questions of law and fact, courts have consistently held that a bankruptcy court need only "canvas the issues [to] see whether the settlement fall[s] below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2nd Cir. 1983), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97; *Roqumore*, 393 B.R. at 480; *Nellis v. Shugrue*, 165 B.R. 115 (S.D.N.Y. 1994); *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992). The Fifth Circuit has further concluded that it is sufficient for a bankruptcy court to find that a substantial controversy exists for which there is an uncertain outcome in litigation. *Jackson Brewing*, 624 F.2d at 610 (affirming a district court's approval of a compromise based on the court's conclusion that there was a substantial controversy between the trustee and the objector with an uncertain resolution).

Courts in this district have recognized the unique role of the Chapter 7 Trustee "in the bankruptcy process as an independent fiduciary, with a completely different perspective and interest in a bankruptcy estate than either a debtor or an individual creditor." *Reed v. Cooper (In re Cooper)*, 405 B.R. 801, 812 (Bankr. N.D. Tex. 2009) (Jernigan, J.). In the words of the Chief Judge of this District, the Honorable Stacey G.C. Jernigan, "the trustee is expected to be a gatekeeper and to exercise his reasonable business judgment in deciding what actions to bring and what are

---

[16] *See Jackson Brewing*, 624 F.2d at 602 (holding that a bankruptcy judge "must evaluate and set forth in a comprehensible fashion: (1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise."); *see also Foster Mortgage*, 68 F.3d at 917–18 (holding that "other factors bearing on the wisdom of the compromise" includes the paramount interest of creditors with a proper deference to their reasonable views and "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.").

not worth the expense. … [T]he trustee is a fair, balanced, and experienced official who can be depended upon to exercise good litigation judgment." *Id.* These are just a few of the reasons that bankruptcy courts grant deference to a trustee's business judgment in proposing a compromise, so far as the compromise falls within the range of reasonable litigation alternatives, as determined by the court's independent evaluation.

### C.      TRUSTEE'S POSITION

The Trustee advanced several arguments in support of the reasonableness and wisdom of the Jackson Compromise. They are summarized by the following points from the Jackson 9019 Motion:

- Of critical concern to the Trustee was the potential outcome of the Adversary Proceeding. The Jackson Compromise does not depend on the outcome of the Adversary Proceeding. The Trustee further believes that the Court will award the Trustee substantial attorney's fees and expenses for the violations of the automatic stay through the DEGA Litigation.

- At a minimum, regardless of the outcome of the Adversary Proceeding, the estate's claims for breach of fiduciary duty against Mr. Neugebauer will be pursued, as will certain other claims.

- The Agreement provides sufficient funds to pay allowed Chapter 7 administrative claims in full, which benefits all unsecured creditors. The Agreement contemplates that litigation counsel will only be compensated from any litigation recovery. Without any additional recovery, approximately $4 million will be left in the estate for litigation expenses and distribution to creditors—in addition to potential recoveries from the pursuit of estate causes of action.

- The terms of the Agent's recovery waterfall are reasonable and are less than what ordinary litigation funding would cost because of the pending disputes regarding the ownership of the estate's causes of action.

- The terms of the Jackson Compromise were negotiated at arm's length, through extensive negotiations and discussions, primarily by legal counsel. There are no undisclosed agreements or understandings.

- There exist colorable litigation claims against many parties involved with the Debtor. The Trustee believes that pursuit of the claims against Mr. Neugebauer as set forth in the Agreement is in the best interests of the Estate.

- The Collateral Agent and Mr. Neugebauer have acted in bad faith post-petition.[17] ECF No. 258, ¶ 32.

## D.      OBJECTING PARTIES' POSITION

Lynwood Partners LLC,[18] Matthew Malouf,[19] Charles Hamilton,[20] the Collateral Agent,[21] and the Debtor[22] (collectively, the Objecting Parties") filed objections to the Jackson 9019 Motion. The Objecting Parties raised numerous arguments urging the Court to deny the proposed compromise:

- Conversion is the preferable alternative to the Jackson Compromise.

- The settlement improperly designates the Agent as the *de facto* Chapter 7 trustee with broad authority to control all estate causes of action and administer and object to claims.

- The grant of derivative standing to the agent to prosecute and control all estate causes of action is not authorized in the Fifth Circuit.

- The Jackson Compromise is a *de facto* release of the DEGA Defendants.[23]

- The proposed settlement, including the grant of authority to control litigation, is not fair and equitable or in the best interests of the estate.[24]

---

[17] The Trustee's testimony was consistent with each of the key takeaways from the Jackson 9019 Motion.

[18] ECF No. 304.

[19] ECF No. 306.

[20] ECF No. 308.

[21] ECF No. 309.

[22] ECF No. 321.

[23] There are no releases contained in the Jackson Compromise; however, it is logical that Mr. Jackson will not sue himself or JIG, at a minimum. Mr. Jackson testified that he has not determined whether to pursue any of the DEGA Defendants as of the time of the hearing.

[24] Many of the Objecting Parties raised concerns regarding whether the $6 million settlement payment was conditioned in some way. Through questioning during the hearing, the Court was assured that the $6.1 million collective payment is conditioned only on an approval order and subject only to those expenses outlined therein.

44

E.       HOW DID WE GET HERE?

The Jackson Compromise did not arrive out of the blue.  As set forth above, the Jackson Compromise comes after eighteen months of the Trustee overseeing this Chapter 7 voluntarily filed by the Debtor in February 2023.  The Collateral Agent is very critical of the Trustee's efforts in this Chapter 7; however, the fact remains that the Trustee attempted a variety of actions in these proceedings to maximize value for creditors.  The Trustee faced opposition at *every* turn from one party or the other.

To even further complicate the issues facing the Trustee, looming over these disputes and issues was the fundamental question of what claims and causes of action the estate owned, or which of the claims and causes of action, if any, were owned by the Debtor's Collateral Agent as a result of the prepetition foreclosure (the events surrounding the foreclosure itself now contested in the Adversary Proceeding). And, even if the foreclosure did not transfer title to any claims and causes of action, the question remained whether the Collateral Agent had any valid or perfected security interests against any causes of action.

Accordingly, because of the complexity, risk, and delay in monetizing the estate's causes of action—which appear to be the only valuable property of the estate—and because there are generally two sides of warring parties each with considerable resources, the Trustee testified that he determined that the best avenue to maximize value for the estate was to sell them at auction to the highest bidder. The Trustee attempted to sell the estate's causes of action starting in November 2023, but each of the Trustee's attempts was thwarted by objections from the various parties in interest. The straw that broke the camel's back was the filing of the DEGA Litigation.

The Trustee testified that the filing of the DEGA Litigation was a watershed moment in the bankruptcy in that interested parties no longer valued the estate causes of action the same way.

45

Parties in interest having previously sought due diligence from the Trustee and having expressed strong interest in participating in the auction thereafter advised the Trustee that their valuation of the assets had changed materially based on existence of the DEGA Litigation. In response to the DEGA Litigation, the Trustee filed the Adversary Proceeding alleging, in part, that the DEGA Litigation contains causes of action that are assets of the bankruptcy estate and therefore violates the automatic stay imposed by section 362 of the Bankruptcy Code.

Still looking for a way to bring order to the case and maximize value for creditors, the Trustee testified that he negotiated with Mr. Neugebauer and the Collateral Agent towards a settlement, culminating in the filing of the Neugebauer 9019 Motion [ECF No. 223], on July 17, 2024, which was joined by Mr. Neugebauer and his related family businesses. ECF No. 236. The key terms of the Neugebauer 9019 Motion were as follows:

- The validity of the foreclosure would be compromised by the Trustee agreeing that the Collateral Agent validly foreclosed on the Debtor's software and software assets only, and the Collateral Agent agreeing that it did not foreclose on any causes of action, such that the estate owns whatever causes of action the Debtor held. The "credit bid" at the foreclosure would be reduced from $7.5 million to $4 million.

- As part of the compromise, the Trustee would agree that the Collateral Agent's security interests extend to causes of action sounding in contract and causes of action sounding in tort relating to damage to, or misappropriation of, intellectual property, and the Collateral Agent would agree that it held no security interests against all other commercial tort claims, including for breaches of fiduciary duty.

- The Adversary Proceeding would be resolved by final agreed judgment as to ownership of causes of action, and all other relief requested—including avoidance of the Collateral Agent's security interests, and damages for violations of the automatic stay—would be dismissed with prejudice.

- The secured claims of the Series 2 Note holders would be allowed, and the estate would grant the Defendants to the Adversary Proceeding releases with respect to the Adversary Proceeding and otherwise. However, Mr. Neugebauer would not be

46

released with respect to any breach of fiduciary duty claims and causes of action, and the Trustee reserved the right to try to sell (or prosecute) claims against him.

- The Collateral Agent would pay $2.25 million to the estate as free and clear funds. Additionally, the Collateral Agent would fund a post-petition loan to the estate, secured by first priority liens and security interests against all property of the estate, except the settlement payment.

- The Trustee would pay $2.5 million to the Series 2 Note holders, to be applied to their claims, thus resulting in a reduction of secured debt.

- The Trustee, the Collateral Agent, and the related Neugebauer parties would enter into a joint prosecution agreement pursuant to which they would pool their respective causes of action and jointly prosecute the same, employing the same counsel (who would be paid from future funding and litigation recoveries and not directly by the estate), and specifying a waterfall that ensures that general unsecured creditors would share in any litigation recoveries. The Trustee would retain his rights in all respects, including with respect to any potential settlements. The Collateral Agent would possess the discretion and authority to prosecute Estate Causes of Action in the name of the Trustee.  The Trustee had the right to seek relief from the Court in the event of the Collateral Agent's gross negligence.  Certain "major decisions"—nonsuit, dismissal, and settlement—would require Trustee approval.

- The motions for relief from the automatic stay filed by the Collateral Agent and the Motion to Convert would be withdrawn or dismissed.

The Neugebauer 9019 Motion was set for hearing on August 15, 2024, and the Adversary Proceeding, the Motion to Convert, and the lift stay motions were abated. *See* ECF Nos. 225, 227.

After the filing of the Neugebauer 9019 Motion, the Trustee testified that he was contacted by JIG's counsel regarding a counterproposal.  At JIG's request, the Trustee and counsel flew to Atlanta and met with Mr. Ayers and his counsel, and Mr. Jackson and his counsel. As the Trustee put it, Mr. Ayers and Mr. Jackson presented the Trustee with their "world view" of the estate's causes of action and the DEGA Litigation, and Mr. Jackson presented the Trustee with a non-

47

binding term sheet to form the basis of a counter-9019 motion. ECF No. 370, at 93-96. The Trustee

considered the existence of a counter-proposal from JIG a "game-changer". *Id.* at 97.

An emergency status conference was requested by the Trustee and held by the Court on

August 1, 2024. ECF No. 235.  At this status conference, the Trustee advised all parties in interest

that a counter-proposal may be forthcoming from another party.  At this juncture, the Court was

clear: If *any party* wished to propose that the estate should go down a different path than that

proposed in the Neugebauer 9019 Motion, it was time "put up or shut up". ECF 268, at 51.  The

Court had been told that statutes of limitations on causes of actions were running. Numerous

motions seeking varying, mutually exclusive forms of relief were pending.  The Court's minute

entry set forth:

> "Hearing on 9019 Motion shall proceed as originally scheduled. The Trustee shall file a
> notice by no later than [August 5, 2024] at noon, indicating whether he believes he has
> received a proposal superior to that of the settlement proposed in the 9019 Motion, and
> attach such proposal. Objections to the 9019 Motion, together with any alternative
> proposals that parties wish the Court to consider as part of the evidence at the 9019 hearing,
> shall be filed no later than [August 9, 2024] at noon. Such filings shall describe the
> alternative proposal with particularity and include a form of documentation and evidence
> of financial wherewithal, if applicable."[25]

The Trustee filed his notice of the proposal from JIG on August 5, 2024. ECF No. 242.

Important to the Bankruptcy Rule 9019 factors, the Collateral Agent and the Neugebauer Parties

had the opportunity to better their proposal.  Thereafter, they withdrew their support for the

Neugebauer 9019 Motion [ECF No. 252], and essentially re-urged their Chapter 11 proposal with

some variation. *Id.* at ¶ 11.  The Collateral Agent then filed objections to various claims, including

that of JIG, and the Debtor sought to lift the abatement on the Motion to Convert.

---

[25] ECF No. 263.

Why is a repeat of this procedural history important? Because it is the backdrop for the resolution of over eighteen months of hard fought, contentious, and virtually non-stop litigation between well-presented parties who have polar opposite world views of the case. This is also the evidence collectively put forth by way of the Trustee's testimony, admitted exhibits or the Court's judicial notice of its own docket pursuant Rule 201 of the Federal Rules of Evidence. Against this evidentiary backdrop, the Court will address the previously described Bankruptcy Rule 9019 factors.

### i. FACTOR 1: THE PROBABILITY OF SUCCESS IN THE LITIGATION, WITH DUE CONSIDERATION FOR THE UNCERTAINTY IN FACT AND LAW

When contemplating the probability of success in the proposed litigation, the Court notes that the issues underlying this compromise are both factually and legally complex. The greater weight of the multi-day hearing was focused on a "I will show you mine, if you show me yours", if you will, of the bona fides of what and who was to blame for GloriFi's failure. Scores of witnesses recounted the events that led to prepetition demise of the Debtor. The vision for GloriFi was undoubtedly transformative, with numerous individuals eschewing conventional investments and jobs, towards a singular dream.

There are two distinct sides to the ultimate demise of GloriFi. *On one side,* there is a story of brilliant, yet eccentric CEO, whose unorthodox management style, included fits of neuroses and manic communications, disregarded corporate formalities and engaged in self-dealing, driven by an unyielding desire not to lose control. *On the other hand,* there is a story of that same brilliant entrepreneur, who although eccentric, was singularly driven to have GloriFi succeed, and when his co-founders and co-investors were unable or unwilling to raise the money needed for the SPAC transaction, he put his and his family's money on the line, driven not by power and a demand for

control, but because only he had the clarity of purpose to see it across the finish line. If this sounds like two movie scripts, the evidence was not that far off.

Both sides put on substantial amounts of evidence concerning the merits of what litigation would look like if Mr. Neugebauer and the Collateral Agent were pursued, on one hand, and the facts that would underlie causes of action against the DEGA Defendants by the Debtor and the Collateral Agent, on the other. Dozens of hours of testimony were taken from scores of witnesses who recounted a fledgling business that attracted almost $100 million in investment and tens of thousands of members in mere months in 2021-2022 and was potentially weeks, if not days, away from a SPAC transaction that could have exponentially proliferated the company. The SPAC transaction never came to pass. On October 13, 2022, a *Wall Street Journal* article entitled *How a New Anti-Woke Bank Stumbled: GloriFi CEO Toby Neugebauer won over A-list investors to build a bank for people who consider Wall Street too liberal,* was published, the source(s) of which are heavily debated, which painted an unflattering picture of the company and its leadership—Mr. Neugebauer in particular. ECF No. 329-52. If that article was not the nail in the coffin of GloriFi, it certainly dug the hole in the ground into which the coffin was pushed. Although approximately $36 million in investment came into GloriFi after this time in Series 2 notes, based on the evidence, the company was in virtually constant turmoil after this article was published, on the brink of bankruptcy, and ultimately laid off all of its staff within weeks.

Again, a compromise is *not* a decision on the merits.[26] It is a resolution to **prevent** from having to determine a portion of the same. And in this case, the Trustee credibly testified that the most logical way to bring value into this estate is the pursuit of one "**storyline**", one version of the

---

[26] As stated above, the Court specifically and intentionally declines to detail the facts alleged by either side in this Opinion because the substantive litigation has not begun, and the Court does not want parties to utilize findings of a hearing on a motion to convert and a motion to approve a compromise to have any preclusive effect on the merits in later substantive litigation.

downfall of the Debtor.  Although the Debtor and the Collateral Agent assert that a Chapter 11 is preferable in that both sets of litigation could theoretically be pursued, the Court cannot negate the value of the Jackson Compromise for *two* important reasons. First, the Trustee has already sought to sell claims against Mr. Neugebauer separately as is proposed by the Debtor, and that process was foiled *primarily* by Mr. Neugebauer and the Collateral Agent in one way or the other.  To give credit to the structure proposed by the Debtor and its CRO is to rewrite the procedural history of this case.  The Debtor and the Collateral Agent *do not* write on a blank slate. The crux of the proposal in the Motion to Convert and the Debtor's proposed plan was previously attempted by the Trustee in large part or will be implemented by the Jackson Compromise.

Additionally, the Debtor and the Collateral Agent give no credence to the second piece of litigation that the Trustee found to be of critical concern—the potential outcome of the Adversary Proceeding. The evidence reflected that in the event of an adverse outcome in that litigation, the estate's prospects at monetizing the claims would likely be diminished, *i.e.* if the DEGA Litigation was somehow found to be appropriate, buyers would pay less than they otherwise might have for the estate's remaining claims against Mr. Neugebauer. The Trustee considers his case strong, but litigation is risky. The Jackson Compromise does not depend on the outcome of that litigation, thus providing a key aspect of the consideration to the estate.

At a minimum, regardless of the outcome of the Adversary Proceeding, the estate's claims for breach of fiduciary duty against Mr. Neugebauer will in fact be pursued, as will certain other claims. Based on the Trustee's investigation to date, he testified those claims have material value,[27] and there is $5 million of D&O insurance in place. Likewise, the Trustee testified that the claims in the Adversary Proceeding are strong, and that the estate will largely prevail, permitting the Agent

---

[27] The Debtor itself "valued" the claims at $4 million by virtue of the floor bid price in the Debtor's draft plan.  *See* ECF No. 275-1 (causes of action against Mr. Neugebauer proposed to be sold with a minimum bid of $4 million).

to assert any and all of the claims in the DEGA Litigation if he so chooses. The Trustee further believes that the Court will award the Trustee substantial attorney's fees and expenses for the violations of the automatic stay by virtue of the filing of the DEGA Litigation.

At worst the probability of success factor is neutral. But the Court comfortably finds that the Trustee bore his burden of showing that there is a probability of success on the merits *with due consideration for the **substantial** uncertainty in fact and law*.

ii. **FACTOR 2: THE COMPLEXITY AND LIKELY DURATION OF THE LITIGATION AND ANY ATTENDANT EXPENSE, INCONVENIENCE AND DELAY**

As stated above, the Court finds that the issues involved in the Jackson Compromise are incredibly complex. Further, declining a settlement, while approving the Motion to Convert, would throw the estate into untold litigation in a Chapter 11 process over appointment of a Chapter 11 Trustee, DIP financing, lien avoidance, and confirmation, to name a few. All of this litigation would have to be funded, and there is no funding currently in existence. The proposed DIP financier's prepetition liens are disputed; thus, a significant portion of their collateral package is disputed. Litigation over the appointment of a Chapter 11 trustee has been all but promised and potential conflicts over varying representations in this case abound.

Meanwhile, all of this bankruptcy litigation would be going on while there is still actual litigation that needs to be filed in rapid order, which could cost millions over many years. That funding is also not in place. The Trustee testified that finding counsel or funding to pursue the litigation proposed by the Debtor and the Collateral Agent in a Chapter 11 will be expensive and difficult to accomplish. Likewise, given the stature and wealth of the litigation targets, appeals are to be expected, resulting in further expense and delay. Lastly, the Court notes that the litigation could become a sideshow to pursuing the causes of actions, which are at the root of the Debtor's insolvency. Therefore, the Court finds that any litigation, due in part to the complexity and novelty

of the issues contemplated, would require the estate to expend valuable estate resources over the course of several years, which it does not have. Accordingly, this factor weighs in favor of approving the Jackson Compromise.

### iii. FACTOR 3: WHETHER THE COMPROMISE SERVES THE PARAMOUNT INTEREST OF CREDITORS WITH PROPER DEFERENCE TO THEIR REASONABLE VIEWS

This factor is a closer call. The Collateral Agent and holders of Series 2 Notes have objected to the Jackson Compromise. The Court will note that the Fifth Circuit in *Foster Mortgage* ***did not*** hold that a court must decide with certainty the legal and factual issues contemplated in litigation in order to overrule the objections of a majority of creditors. Creditors are not given a "veto" right. *Foster Mortgage*, 68 F.3d at 919 ("We are careful to add that we are creating no per se rule allowing a majority of creditors in interest to veto a settlement."). Indeed, in a subsequent opinion, *Cajun Electric*, the Fifth Circuit makes clear: "it is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement," and further that "***the desires of the creditors are not binding.*** … [T]he test is not the desires of the majority as such, but the ***best*** interests of the creditors, taking into account their reasonable views." *Cajun Elec.*, 119 F.3d at 356-58 (emphasis added). The Fifth Circuit has separately held that:

> [A] trustee 'realistically cannot be required to demonstrate to the satisfaction of every individual creditor and the debtor, or to any compelling degree of certitude, that the settlement benefit the [estate] and the value of the settled claim comprise a matched set' … the trustee need only reach an informed judgment that it would be 'prudent to eliminate the inherent risks, delay, and expense of prolonged litigation in an uncertain case.'

*In re Solomon*, 129 F.3d 608, 614 (5th Cir. 1997). Taken holistically, what the Fifth Circuit instructs is that a court must show deference to the reasonable views of the creditors ***by considering*** the amount of creditor support for a compromise, and further, a court may not ***ignore*** creditors' overwhelming opposition to a settlement.

The Court finds the underlying facts of *Foster Mortgage* to be instructive in coloring the Fifth Circuit's ruling in that case. In *Foster Mortgage*, a debtor subsidiary was settling a claim it had against **its own parent corporation**, and most notably, the proposed settlement was undertaken without the participation of **any** creditor. *Foster Mortgage*, 68 F.3d at 918. That is clearly not the situation before the Court in the instant case. There are two major distinctions here: (1) the Jackson Compromise is truly the product of arms-length bargaining with third party creditors and litigation counterparties; and (2) the proposed settlement is actively approved by certain of the estate's creditors.

The evidence clearly showed that the Trustee spent many months investigating the estate's assets, which were determined to be primarily causes of action, and made a number of attempts to sell them. Those efforts were quelled by the Collateral Agent and Mr. Neugebauer, by virtue of the objections to OnPoint's liens and foreclosure, and more so by the filing of the DEGA Litigation, which Mr. Jackson and the Trustee testified negatively affected the sale price the Trustee could obtain for causes of action against Mr. Neugebauer by calling into question the ownership of same.

Perhaps more importantly, the precursor to the Jackson Compromise was the Neugebauer 9019 Motion, which the evidence reflected served as the precedent and skeleton for the Jackson Compromise, with the critical differences being that the Jackson Compromise provides a greater amount of cash, does not require the estate to incur further debt, but admittedly, does not embody the future sale of causes of action against the non-compromising side of the litigation. The Trustee engaged with all objecting creditors and even faced threats of litigation from Mr. Neugebauer and the Collateral Agent when he informed the Court that he had received a counterproposal from JIG. *See* ECF No. 234 (alleging the Trustee had breached his obligations and JIG had committed tortious interference). Ultimately, the Court directed the Trustee and interested parties to submit

54

any proposals of sale or compromise to the Trustee by a date certain.  The Trustee was able to negotiate an increase in consideration for the estate.  Therefore, the Court finds that it is without question that the Objecting Parties' opinions were ***adequately considered*** and that the proposed settlement was the product of an arms' length bargain.

Furthermore, the Court must note that it is not altogether surprising that there is a dispute between these particular creditors; there being creditor dissention is more the norm than an outlier ***in this case***. The historical "bad blood" between the Series 1 and the Series 2 noteholders boiled over into the bankruptcy, which is not unexpected given this compromise primarily determines who the litigation targets will be by virtue of the compromise. Although the Court appreciates and compliments the estate's creditors on their legal prowess and the zeal with which they pursue their interests in this Chapter 7 case, that zeal has without question ***cost*** the estate a great deal in additional administrative expenses through repeated contested litigation.  Therefore, even though the Objecting Parties certainly represent a great deal of the debt in this bankruptcy case, the Court still believes that the compromise is in the best interests of the estate as a whole, because it brings encumbered cash into the estate, pays the freight of Chapter 7 litigation to date, narrows controversies, and provides the hope of future litigation proceeds, with the initial cost of such litigation being borne by the Agent, GloriFi Acquisition.

Finally, on this point, the Court wishes to once again reiterate that if the Objecting Parties wished to better the terms of the Neugebauer 9019 Motion, they had the chance to do so and they declined to engage with that option meaningfully. Instead, they chose to move forward with the Motion to Convert, which suffers from the frailties described at length above.  Again, the only arguable "better" tangible term in the Neugebauer 9019 Motion or the Motion to Convert was the potential sale of the Neugebauer related causes of actions (which again, the Trustee had already

55

attempted). However, as discussed above, that portion of the "Chapter 11" option was marred by conflict, undefined processes, a lack of liquidity, and the promise of future bankruptcy litigation. Furthermore, the Trustee credibly testified that, in his experience *in this case* and in his decades of experience as a trustee working with litigation financiers, the value of causes of action decreases if a litigant is pursuing alternative "storylines" of the demise of a business. The Court finds that these facts cut against the reasonableness of the views expressed by the Objecting Parties in their opposition to the Jackson Compromise.

The objectors also raised two related legal impediments to the Jackson Compromise. First, the Collateral Agent and the Debtor argue that the Jackson 9019 Motion should be denied because the Jackson Compromise improperly delegates the Chapter 7 Trustee's authority to administer the estate for the benefit of all creditors to a sole creditor. They argue that, in the Agreement, the Trustee proposes to essentially delegate his duties to administer the estate to the Agent, but these duties cannot be assigned or delegated to a third party. Relying on sections 323 and 704 of the Bankruptcy Code, they argue that the Trustee improperly abdicates his duties under section 704(a) and surrenders his duties to the "whims (or self-interests) of the Agent", including the sole authority to pursue and manage Estate Causes of Action and object to claims.

The Court will dispense with the last part of the objection first. The Jackson Compromise does *not authorize* an abdication of the Trustee's duty to object to claims. On the contrary, the Agreement provides:

> Pursuant to the JPA, the Agent and the Trustee shall jointly object to claims as appropriate. The Agent may unilaterally assert, file and prosecute claim objections and is authorized to do so without further order of the Court.[28]

---

[28] ECF No. 258, ¶ 41.

The Trustee retains his right (and frankly, duty) to object to claims.  The fact that the Agent may also file claim objections is of no moment given that JIG, the proponent of the Jackson Compromise, will possess an allowed $10 million claim as part of the Jackson Compromise and could file its own claim objection.  A growing number of courts have recognized that holders of allowed claims have standing to object to claims in Chapter 7 pursuant to section 502(a) of the Bankruptcy Code. 4 COLLIER ON BANKRUPTCY ¶ 502.02 (16th ed. 2024 ). "The language of section 502(a) is clear and unambiguous. It plainly authorizes a party in interest to object to any claim or interest, proof of which is filed under section 501 of the Code. Nowhere is this right made subject to any other provision of the Code or to the Trustee's refusal to pursue possible objections to certain claims." *Whiteley v. Slobodian (In re Mechanicsburg Fitness, Inc.),* 592 B.R. 798 (Bankr. M.D. Pa. 2018); *see also In re C.P. Hall* Co., 513 B.R. 540 (Bankr. N.D. Ill. 2014) ("the right to object to claims that section 502(a) grants creditors ... is unqualified").  Even if this were not the case, the Trustee can (and does) consent to the Agent's right to object to claims, whose consent other courts have found is a precondition to the right of a creditor to object. *In re Trusted Net Media Holdings, LLC,* 334 B.R. 470, 476-77 (Bankr. N.D. Ga. 2005) (collecting cases standing for the proposition that creditor lacks standing to participate in trustee's objection unless trustee declines or refuses to object to claims).  Accordingly, given that the Trustee maintains his right and duty to object to claims, the Jackson Compromise does not act as an abdication of the Trustee's statutory duties pursuant to section 704(a)(5) of the Bankruptcy Code.

With respect to the Objecting Parties' argument regarding the Agent's right to "control" future litigation, the Trustee and JIG counter that this argument is hypocritical given that the greater part of "meat and bones" of the Jackson Compromise was based upon the almost identical terms

of the Neugebauer 9019.  For example, the Neugebauer 9019 Motion contained the following

terms:

> The Collateral Agent and the Trustee shall enter into the Joint Prosecution Agreement. …
> The Joint Prosecution Agreement shall vest discretion and authority to prosecute the Estate
> Causes of Action in the Collateral Agent; *provided*, *however*, that any settlement of an
> Estate Cause of Action in an amount of more than $5 million shall be subject to Bankruptcy
> Court approval. For the avoidance of doubt, the Trustee acknowledges that the Collateral
> Agent shall be empowered and entitled to bring suit for Estate Causes of Action in the
> name of and on behalf of Trustee and shall be further empowered to add the Trustee as a
> party to existing litigation or substitute the Trustee as a party to existing litigation. In the
> event the Collateral Agent is grossly negligent in the prosecution of Estate Causes of
> Action, the Trustee may seek relief from the Bankruptcy Court from this provision and the
> Joint Prosecution Agreement. Major Decisions require the Trustee's approval, which
> approval shall not be unreasonably withheld. Major Decisions are limited to non-suiting,
> dismissing, or settling Estate Causes of Action.
>
> The Trustee and his counsel shall be kept apprised of all litigation of Estate Causes of
> Action and are entitled to advise, but not direct, the Collateral Agent's prosecution of any
> Estate Cause of Action. The Collateral Agent agrees to indemnify the Trustee and his
> counsel in the event any sanctions are entered against the same as a result of the Collateral
> Agent's actions, inactions, omissions, and the like in the prosecution of any litigation
> controlled by the Collateral Agent.
>
> . . .
>
> Contemporaneously with filing the motion for entry of the 9019 Order, the Trustee shall
> file an application (the "Employment App") to employ Special Counsel as special litigation
> counsel to pursue the Estate Causes of Action. It shall be a default under this agreement if
> the Court does not enter an order granting the Employment App upon terms reasonably
> acceptable to the Collateral Agent contemporaneously with its 9019 Order. The Trustee
> shall employ further other professionals to provide services to the Estate as may be
> reasonably requested by the Collateral Agent or Special Counsel.[29]

The similarity in structure is palatable. Aside from the fact that the Collateral Agent and

Mr. Neugebauer asked the Court to approve an almost identical framework in the Neugebauer

9019 Motion, the Court believes that recent Fifth Circuit authority supports, by analogy, the

structure of the Jackson Compromise.  In *In re South Coast Supply*, the Fifth Circuit was called

---

[29] ECF No. 223-1, ¶¶ 33-34.

upon to determine whether a trustee could sell causes of action belonging to the estate pursuant to

Section 547 of the Bankruptcy Code, also known as preference claims. 91 F.4th 376 (5th Cir.

2024). It is without question that preference actions are creatures of bankruptcy and that the

Bankruptcy Code states that only a "trustee" may pursue the same. *See* 11 U.S.C. § 547. However,

the Fifth Circuit held that such causes of action are also property of the estate pursuant to section

541 of the Bankruptcy Code and may be sold in order for the trustee to maximize value for the

estate. *South Coast Supply*, 91 F.4th at 382. Specifically, the Fifth Circuit reasoned as follows:

> In approving such sales, bankruptcy courts must ensure that fundamental bankruptcy policies of asset value maximization and equitable distribution are satisfied. Bankruptcy courts must make those decisions on a case by case basis in light of the factual circumstances. Allowing the sale of preference actions will grant bankruptcy courts more flexibility in distributing assets, maximize the value of the bankruptcy estate, and in turn, allow for more equitable distribution of assets.
>
> In fact, allowing for the sale of preference claims may be the most equitable option. For example, in some cases, the estate may not have sufficient funds to pursue preference actions. By assigning the actions to creditors who may be able to pursue the actions, the bankruptcy court and the debtor have more flexibility in distributing the remaining assets and can most effectively maximize the bankruptcy estate. Maximization of the bankruptcy estate certainly benefits all creditors, as there are more assets to be distributed.

*Id.* at 384 (internal citations omitted); *In re Lahijani*, 325 B.R. 282, 288 (B.A.P. 9th 2005) ("The

court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under

the circumstances."); *In re Simply Essentials, LLC*, 78 F.4th 1006, 1010 (8th Cir. 2023) ("When an

estate cannot afford to pursue avoidance actions, the best way to maximize the value of the estate

is to sell the actions."); *see also In re P.R.T.C.*, 177 F.3d 774, 777 (9th Cir. 1999) (allowing the sale

where the estate did not have the funds to pursue the avoidance claims, but believed they may be

valuable). The Fifth Circuit went on to further hold that the buyer of such claims has standing to

pursue the same regardless of whether it is a representative of the estate. *South Coast Supply,* 91

F.4th at 384.

Here, the Trustee, has a statutory directive pursuant to section 704(a)(1) of the Bankruptcy Code to "collect and reduce to money the property of the estate for which such trustee serves", and "if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper." 11 U.S.C. § 704. In his business judgment, he determined that the best way to maximize value of the Estate Causes of Action was to accept $6.1 million (and a percentage recovery from future litigation) and partner with the Agent in future litigation, at a minimum, against Mr. Neugebauer, which litigation the Debtor values in its own plan at $4 million. In *Moore*, the Fifth Circuit noted that that "[b]ankruptcy courts may determine, in any given situation, whether a sum-certain offer maximizes estate assets or whether, instead, an offer that includes a portion of future recoveries is more appropriate." *In re Moore*, 608 F.3d at 262 n.19 (citing *Lahijani*, 325 B.R. at 288).

Now, the Court does not gloss over the fact that this transaction may not be the straightforward sale at issue in *South Coast Supply*; rather, it is in the nature of joint prosecution (as had been proposed by the Collateral Agent and Neugebauer previously). However, section 42 of the Agreement provides that the Trustee is selling "free and clear of any and all claims and encumbrances of any kind or type … the Debtor's and the Estate's right given to the Agent hereunder." ECF No. 258-1, at ¶ 42. With certain nuance that the Court will discuss shortly, the Court believes this distinction not to be significant enough to warrant a departure from the reasoning of *Moore* and *South Coast Supply*. Nothing prevents a trustee from partnering with an interested party toward estate recoveries, as part of his duty to maximize value for creditors, **so long as** the Trustee retains his own independent discretion and fiduciary relationship to the Court. It is this portion of the Jackson Compromise (and the Neugebauer 9019 settlement) that somewhat troubles the Court.

The Jackson Compromise contains the following term:

> Subject only to the major decisions described below, Agent shall have sole authority to prosecute, not prosecute, negotiate, settle or otherwise dispose or not dispose of the Estate Causes of Action. No other party shall be entitled to assert any Estate Causes of Action, as such sole authority over Estate Causes of Action is vested in the Agent.[30]

Major decisions are limited to non-suiting, dismissing, or settling Estate Causes of Action.[31]

> Notwithstanding the foregoing, the Agreement further provides that:

> The Trustee shall timely file an application (the "Employment App") in the Bankruptcy Court to employ special litigation counsel ("Special Counsel") to the Estate to pursue the Estate Causes of Action, such Special Counsel selected by Agent. The Trustee shall employ further other professionals to provide services to the Estate as may be reasonably requested by the Agent or Special Counsel, as selected by the Agent.
>
> . . .
>
> The Parties agree to share work product, attorney/client and other privileges in furtherance of the JPA and the prosecution and defense of the matters currently pending or to be filed in the Bankruptcy Court, and with respect to related matters raised in any other jurisdiction, venue or proceeding.[32]

Given the sharing of the Trustee's privilege, the retention of counsel and the sharing of estate litigation proceeds, the Court finds this list of "Major Decisions" overly restrictive for a duly appointed estate fiduciary to the extent that such provision can be read to materially alter the Trustee's fiduciary duties to the estate or the duty of candor to the Court. Should the Agent wish to prosecute jointly the Estate Causes of Action with the Trustee as the JPA provides, the Court expects and requires that the Trustee's discretion not be arbitrarily limited. If the Agent wishes to sue "on behalf of" the Trustee, then the Trustee's judgment on material matters and litigation decisions should be reasonably sought and considered. Accordingly, as part of the approval of the Jackson Compromise, the Court will order that the Trustee be *reasonably consulted* with respect to material decisions on whether to prosecute, not prosecute, negotiate, settle or otherwise dispose

---

[30] ECF No. 258-1, ¶ 21.
[31] *Id.*
[32] *Id.* at ¶¶ 25,26.

or not dispose of the Estate Causes of Action. The Court is not giving the Trustee a veto right, but he is certainly entitled to a consultation right such that the Court can find solace that although an independent estate professional may not be steering the ship, he is effectively aware of what is going on in the captain's bridge. Again, these are estate claims, and only the Trustee is the estate fiduciary.

The second, related argument made by the Objecting Parties is that Jackson Compromise should not be approved because the Bankruptcy Code does not authorize the Trustee's "wholesale grant of derivative standing to the Agent to control and prosecute all Estate causes of action and have the authority to decide which actions to prosecute." ECF 309. The Objecting Parties argue that whether a creditor can be granted derivative standing in a Chapter 7 case is an open question in the Fifth Circuit, but that lower courts within the Fifth Circuit, including Chief Judge Jernigan in *Cooper*, have held either that such standing should not be granted, or can only be granted in exceptional circumstances on a case-by-case basis. *See, e.g.*, *Cooper*, 405 B.R. at 814.[33] Respectfully recognizing that *Cooper* holds that "neither the statutes, nor the overall policies embodied throughout the Bankruptcy Code, support giving individual creditors derivative standing to pursue estate actions a Chapter 7 case,"[34] it bears repeating that the Neugebauer 9019 Motion sought nearly identical relief. ECF No. 223-1, at ¶¶ 33-34.

---

[33] *See also Custom Food Grp., LP v. McCulloch (In re Wilson)*, 527 B.R. 253, 257 (Bankr. N.D. Tex. 2015) ("There is no explicit statutory authority granting a non-trustee party the power to sue on behalf of the trustee; the derivative powers recognized by the courts in Chapter 11 do not apply in a Chapter 7 case"); *In re On-Site Fuel Serv.*, No. 18-04196-NPO, 2020 Bankr. LEXIS 1257, at *36-37 (Bankr. S.D. Miss. 2020) ("Given the role of a Chapter 7 trustee as an independent fiduciary, however, the application of a different standard in consent to standing cases in the Chapter 7 context makes sense"); *SunTrust Bank v. Matson (In re CHN Constr., LLC)*, 531 B.R. 126, 133 (Bankr. E.D. Va. 2015) ("The Court finds that derivative standing is not appropriate in Chapter 7 cases."); *Gecker v. Marathon Fin. Ins. Co. (In re Auto. Prof'ls, Inc.)*, 389 B.R. 630, 635 (Bankr. N.D. Ill. 2008) (reasoning that to "confer a type of 'helper' or 'buddy' standing upon a party who is not asserting his own right under substantive law but seeks merely to assist the rightful plaintiff in pursuing his case . . . violates the important principles of prudential standing that each party possess the right to the relief sought under substantive law").

[34] *Cooper*, 405 B.R. at 314.

In *Cooper*, Mr. and Mrs. Cooper filed an individual Chapter 7 case and a trustee was appointed. The Chapter 7 trustee and a large unsecured creditor, as joint plaintiffs, filed an adversary proceeding against Mr. Cooper seeking to revoke his discharge, compel turnover of non-exempt assets and obtain a judgment based on false representations. Subsequently, the Chapter 7 trustee entered into a settlement with the debtors unilaterally.  The creditor objected, arguing that the Chapter 7 trustee should not be able to settle the entire case because the creditor could have brought its own motion to revoke Mr. Cooper's discharge. While the bankruptcy court approved the settlement, on appeal the district court affirmed the trustee's settlement with the debtor, but reversed that portion of the ruling forcing the creditor to dismiss its revocation request. On remand, the settlement fell through. Thereafter, the creditor requested "authority to prosecute *all* of the causes of action in the trustee's stead." *Cooper*, 405 B.R. at 805-6. The court found that "the Trustee opposed the somewhat forced abdication of her responsibilities and authority as Trustee." *Id.* at 806-7 (emphasis in original).

The *Cooper* court rejects derivative standing in a Chapter 7 case because it finds no textual basis for derivative standing in any provision of the Bankruptcy Code applicable to Chapter 7. *Id.* at 807. Significantly, the *Cooper* court based a portion of its holding on the premise that a creditor or non-trustee lacks independent standing to pursue causes of action owned by the estate. *Id.* at 809. Likewise, noting that Chapter 7 trustees are independent and do not have the potential conflicts of interest inherent in Chapter 11 cases, the court correctly notes that there are procedures in place for creditors to challenge the business judgment of a trustee. And, importantly, the *Cooper* court expressed concerns regarding the "hijacking" of a Chapter 7 bankruptcy case by a non-statutory fiduciary and the potential it has to run afoul of the fresh start policy for individual debtors. *Id.* at 813. Thus, the court concludes that it is not good policy to usurp the trustee's role in

63

a Chapter 7 case. While the Court does not disagree with many of the observations made by the *Cooper* court, it parts ways based on the facts of this case and more recent Fifth Circuit jurisprudence.

First, *Moore* and *South Coast Supply* make clear that non-statutory fiduciaries may bring causes of actions belonging to the estate. Likewise, this is not a "hijacked case" like that which the *Cooper* court faced—this is a Chapter 7 trustee who has determined it is in the best interest of the estate to sell and/or otherwise permit a creditor to prosecute a cause of action because he has no funds to do so. In no sense is this a hijacking of a bankruptcy case or a derogation of a Chapter 7 trustee's fiduciary duty. Indeed, the Trustee here is administering this asset by finding a way to monetize it; he was not neutral or absent." *In re Pursuit Cap. Mgmt., LLC*, 595 B.R. 631, 662 (Bankr. D. Del. 2018) (distinguishing *Cooper* on similar facts). The Trustee attempted a sale of the causes of action at auction, considered two parties' settlements, obtained a favorable compromise (which he negotiated for the better), and will jointly prosecute estate causes of action for the good of the estate. No one is usurping the role of the Trustee. In this way, *Cooper* is factually inapposite.

Finally, in *Cooper*, the court plainly notes that if there was power in a Chapter 7 case to grant derivative standing to a creditor, that creditor had not presented "compelling" circumstances to grant such standing. *Cooper*, 405 B.R. at 814. Assuming, like the court in *Cooper*, that the Fifth Circuit's holding in *Louisiana World* would be the controlling standard, the Fifth Circuit articulated three considerations relevant in determining whether derivative standing could be granted to a creditors' committee in Chapter 11: (1) whether the claim is colorable; (2) whether the debtor in possession or the trustee unjustifiably refused to pursue the claim; and (3) whether the creditors' committee first received leave to sue from the bankruptcy court. *Louisiana World Exposition, Inc. v. Fed. Ins. Co. (In re Louisiana World Exposition, Inc.)*, 858 F.2d 233, 252 (5th Cir. 1988). In this

case, (1) the Court finds the claims are colorable; (2) the Trustee has no funds to pursue the claims himself, and the outright sale thereof has proven unsuccessful; and (3) the Trustee and the Agent are requesting leave of court by way of the motion for approval of the compromise. Accordingly, if applicable, *Louisiana World*, would be satisfied.

Finally, the Objecting Parties argue that the proposed settlement provides a disproportionate advantage to one creditor to control the entirety of the Estate Causes of Action. This argument strains credulity given that these same parties also sought to control litigation as part of their own compromise *and* granted the Collateral Agent allowed claims, immediate distributions and releases under their own proposal.

In sum, although the Jackson Compromise may not fit neatly into the "derivative standing" box, under the specific facts of this case, the Court is called upon to determine whether, pursuant to Bankruptcy Rule 9019, the compromise sufficiently serves the paramount interests of creditors with proper deference to their reasonable views. The Court find that it does. At this juncture, two years into this case, the Trustee has chosen the "horse" that: (1) brought the highest cash value to the table after competitive counterproposals; (2) provides sufficient funding to pay off all Chapter 7 fees; (3) provides a distribution to all creditors; (4) allows for a continuation of the Adversary Proceeding; (5) contains a fair sharing percentage on future litigation with ready, willing and able funding of litigation expenses; and (6) brings clarity as to a singular path for litigation going forward. Likewise, the compromise is based in substantial part on the competing proposal crafted by the opposing creditors. The Court finds that all of these benefits *collectively* yield a compromise in the best interest of the creditors of this estate.

iv. **FACTOR 4: THE EXTENT TO WHICH THE SETTLEMENT IS TRULY THE PRODUCT OF ARMS-LENGTH BARGAINING AND NOT OF FRAUD OR COLLUSION**

The Court finds that the Trustee unquestionably acted in good faith and that the Jackson Compromise is the product of arms-length bargaining; it is not the product of fraud or collusion. The Trustee testified that he conducted the proper due diligence, albeit perhaps late in the game after the sale process failed, fairly considered each of the parties' proposals, including the benefits and burdens of each, and determined that the Jackson Compromise was superior.  He testified that the negotiation between his and JIG's counsel occurred at arm's length and that the settlement structure was based in large part off of the Neugebauer proposal. Importantly, the Objecting Parties were given an opportunity by the Court and ***declined*** to better their offer in a way the Trustee found meaningful.  In sum, the Objecting Parties ultimately raised no reasonable objection to the fact that the settlement was not arm's length. The Court finds this factor weighs in favor of the Jackson Compromise.

v. **ALL OTHER FACTORS BEARING ON THE WISDOM OF THE COMPROMISE**

Finally, the Court believes that the current posture of the Chapter 7 case, including the fact that the Trustee has not been able to secure contingency counsel, and the estate is cash poor, all weigh in favor of the approval of the Jackson Compromise.  The Trustee credibly testified that there was a scarcity of funding resources for the estate and well-heeled parties on both sides.  In the Trustee's opinion, the viability of causes of action are diminished if two counter avenues are sought.  Statutes of limitation are on the verge of expiration. The Jackson Compromise brings a certainty of funding, certainty of the pursuit of causes of action and a singular path forward, in important part funded by the Agent.  It was the best offer on the table for the Trustee.  Importantly, the Court gave all parties an opportunity to bring their best settlement offer forward. The fact that both sides had an opportunity to counter the proposal is significant to the Court's consideration.

66

For the foregoing reasons, the Jackson Compromise is in the best interest of these estates and a reasonable settlement of long-standing, complex disputes in this Chapter 7 estate.

### F.    CONCLUSION.

Based on the foregoing factors, the Court holds that the Jackson Compromise is fair and equitable. Could the Trustee have fared better in any portion of this settlement? Maybe so. However, that is not the operative question, nor the standard by which a settlement is considered under Bankruptcy Rule 9019. Likewise, is it certain that the Motion to Convert would not achieve similar results? No. That, too, is uncertain and that, too, is not the operative question nor the standard by which the Court must consider the Jackson 9019 Motion. The question decided by the Court on this Motion is whether the Jackson Compromise is a wise one and whether approving such would ultimately benefit the estate, when compared with the alternative of expensive, contested protracted litigation in Chapter 11 after the Debtor was voluntarily put into Chapter 7 a year and a half prior. The answer to that question, in the Court's estimation, is a firm yes.

To be clear, the magnitude of time spent, pleadings filed, hearings held, and arguments raised by the parties getting to ***this point*** speaks volumes on the nature of what substantive a Chapter 11 process and merits litigation would entail. The cost and complexity of that litigation would be time-consuming and contentious. The estate's prospects in the proposed Chapter 11 are dubious. The Jackson Compromise was the result of almost two years of investigations, attempts at monetizing the causes of action, varying alliances, arms-length bargaining, and discovery, by the Chapter 7 Trustee. Although Mr. Neugebauer, the Collateral Agent, and related Series 2 creditors oppose the settlement, the Trustee bore his burden to bring forth a compromise that meets the Fifth Circuit's mandate for approval of a compromise under Bankruptcy Rule 9019 and which falls well above the lowest range of reasonableness.

Based on the foregoing, it is hereby:

**ORDERED** that the Trustee shall prepare a form(s) of order consistent with this Opinion.

**###END OF ORDER###**

# Exhibit 2

**Order Denying Motion to
Convert Case to Chapter 11
(Doc. No. 398)**



**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Michelle V. Larson*

_____

**Signed January 24, 2025**                    **United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Case No. 23-30246-mvl-7 |
| WITH PURPOSE, INC., | § § § | (Chapter 7) |
| Debtor. | § § § | |

## ORDER DENYING MOTION TO CONVERT CASE TO CHAPTER 11

CAME ON FOR HEARING the *Amended Motion to Convert Bankruptcy Case to Chapter 11 Pursuant to Section 706(a) of the Bankruptcy Code* [docket no. 275] (the "Motion"), filed by debtor With Purpose, Inc.  For the reasons stated in the Court's *Memorandum Opinion Denying Conversion to Chapter 11 and Granting the Trustee's Compromise with Jackson Investment Group Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure* [docket no. 396], the Motion is hereby DENIED.

# # #  END OF ORDER  # # #

# Exhibit 3

**Order Granting Trustee's Motion for Approval of Compromise and Settlement with, and Sale to, Jackson Investment Group, LLC (Doc. No. 399)**



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 24, 2025**

_____
**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Case No. 23-30246-mvl-7 |
| WITH PURPOSE, INC., | § § § | (Chapter 7) |
| Debtor. | § § § | |

## ORDER GRANTING TRUSTEE'S MOTION FOR APPROVAL OF COMPROMISE AND SETTLEMENT WITH, AND SALE TO, JACKSON INVESTMENT GROUP, LLC

CAME ON FOR HEARING the *Trustee's Motion for Approval of Compromise and Settlement Under Bankruptcy Rule 9019 and Sale of Assets* [docket no. 258] (the "Motion"), filed by Scott M. Seidel (the "Trustee"), the duly appointed Chapter 7 trustee of With Purpose, Inc. (the "Debtor"), the debtor in this bankruptcy case (the "Bankruptcy Case"), and of its bankruptcy estate (the "Estate"). By the Motion, the Trustee requests the Court's approval of the *Agreement* attached as Exhibit A to the Motion and introduced into evidence at said hearing (the "Agreement") between the Trustee and GloriFi Acquisitions, LLC (the "Agent"), as part of an overall settlement (the "Proposed Settlement") between the Trustee and Jackson Investment Group, LLC ("JIG").

---

ORDER GRANTING TRUSTEE'S MOTION FOR APPROVAL OF COMPROMISE AND SETTLEMENT WITH, AND SALE TO, JACKSON INVESTMENT GROUP, LLC—Page 1

Capitalized terms used in this Order and not defined herein have the meanings assigned to them in the Agreement. The Trustee provided proper, timely, adequate and sufficient notice of, and a fair and reasonable opportunity to object and be heard, with respect to the Motion and the hearings related thereto.

On January 22, 2025, the Court entered its *Memorandum Opinion Denying Conversion to Chapter 11 and Granting the Trustee's Compromise with Jackson Investment Group Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure* [docket no. 396] (the "Memorandum Opinion"). For the reasons stated in the Memorandum Opinion,[1] including the Court's core jurisdiction to enter this Order, it is hereby:

ORDERED that the Motion is GRANTED as provided for herein; it is further

ORDERED that any objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled and all reservations of rights are OVERRULED on the merits with prejudice; it is further

ORDERED that the Proposed Settlement is APPROVED; it is further

ORDERED that the Agreement is APPROVED and that it shall govern according to its terms, and that the Trustee is authorized and directed to immediately execute and deliver the Agreement and all related documents, and thereafter, is authorized without need for further order to implement, effectuate, and perform the Agreement; it is further

ORDERED that the Agreement shall be effective only upon the payment of the $6,100,000.00 consideration under the Agreement to the Trustee, less the $250,000.00 previously

---

[1] The findings and conclusions of law set forth herein and in the Memorandum Opinion constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such. The Court's findings also shall include any oral findings of fact and conclusions of law made by the Court on December 6, 2024.

deposited as earnest money, immediately upon which the Trustee shall file a notice of the receipt of such funds with the Court; it is further

ORDERED that, without limiting the generality of the foregoing approval of the Agreement, the Agent shall at all times reasonably and timely consult with the Trustee with respect to material decisions, that are otherwise the Agent's decisions under the Agreement, regarding whether to prosecute Estate causes of action, not to prosecute them, negotiations regarding the same, and all issues related to potentially settling, abandoning, or otherwise disposing of Estate causes of action, which obligation shall be actionable under this Order even if not expressly stated in the Agreement, and which obligation the Agent agrees to pursuant to its signature to this Order below; it is further

ORDERED that the Agent shall have all authority and agency over Estate Causes of Action as provided for in the Agreement, including section 21 thereof, and may appear and be heard in any court, and prosecute any Estate Cause of Action, for and in the name of the Estate, subject to the Joint Prosecution Agreement, the Agreement, and all provisions of this Order applicable to the same; it is further

ORDERED that the $6,000,000.00 payment to the Trustee under section 17 of the Agreement shall be free and clear, unencumbered funds and property of the Estate; it is further

ORDERED that the sale of the following property of the Estate: (i) the Debtor's Estate's rights to the Agent under the Agreement and the Joint Prosecution Agreement; (ii) all rights of the Debtor and the Estate to the name "GloriFi," including in any trademark; and (iii) all stock, shares, or similar expressions of equity ownership in each of the Debtor's subsidiaries, shall, pursuant to 11 U.S.C §§ 363(b) and (f) (including but not limited to (f)(4)), be free and clear of all liens, claims, interests, and encumbrances of any kind or type, and the Trustee is authorized and directed to

execute and to deliver to the Agent such documents and instruments as may be prepared by the Agent and as may be reasonably necessary or advisable to evidence such sale, and that all such liens, claims, interests and encumbrances as may exist or be asserted against items (ii) and (iii) in this paragraph shall be adequately protected by attaching to the $100,000.00 payment to the Trustee under section 17 of the Agreement with the same validity, extent, and priority as otherwise exists, but subject to all defenses, avoidance actions, and other rights of the Trustee regarding the same, and that the Trustee may not use any portion of said $100,000.00 pending further order of the Court; it is further

ORDERED that the foregoing sale of property of the Estate within the meaning of 11 U.S.C. § 541(a) shall be without warranty and on an "as is, where is" basis; it is further

ORDERED that effective as of the closing date for the Agreement, the sale and assignment of the purchased Estate property to the Agent shall constitute a legal, valid and effective transfer, notwithstanding any requirement for approval or consent by any person, and will vest the Agent with all right, title and interest of the Debtor and Trustee in and to the purchased Estate property, free and clear of all liens, claims, interests and encumbrances of any kind or type pursuant to 11 U.S.C. § 363(f); it is further

ORDERED that all parties-in-interest, including each creditor, are COMMANDED and ENJOINED from interfering in any way with, or contesting the ownership of, or asserting any liens, claims, interests, and encumbrances against, the Agent or as to the purchased Estate property, and all persons or entities in possession or control of any of the purchased Estate property are directed to surrender possession or control to the Agent on the Agreement closing date or as soon thereafter as able; it is further

ORDERED that the provisions of this Order authorizing the sale and transfer of the purchased Estate property shall be self-executing, and: (i) all liens, claims, interests, and encumbrances on the purchased Estate property shall be unconditionally released, discharged and terminated as to the Agent and the purchased Estate property; (ii) neither the Trustee nor the Agent shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate or implement the provisions of this Order; and (iii) the Trustee and Agent shall be authorized, but not directed, to file any such releases, termination statements, assignments, consents or other instruments in any jurisdiction to record the release, discharge and termination of the liens, claims, interests, and encumbrances on the purchased Estate property pursuant to the terms of this Order including filing, registering or otherwise recording a certified copy of this Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all liens, claims, interests, and encumbrances on the purchased Estate property; it is further

ORDERED that all governmental units are COMMANDED and ORDERED to effectuate the sale of the purchased Estate property including, if necessary, to accept for filing or recording this Order and any reasonably appropriate document or instrument from the Agent evidencing such sale, and this Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, local, tribal or foreign government agency, department or office; it is further

ORDERED that any proceeds or recoveries that may be collected by Agent, including with respect to the payment of any Special Counsel's (as defined in the Agreement) fees or expenses and including with respect to the Preference (as defined in the Agreement), shall be property of the Estate, subject to the rights of the Agent thereto and subject to alleged security interests and

liens that may exist, and the Agent shall account to the Trustee and the Estate for all such proceeds or recoveries and may not effectuate a setoff against the same without approval of the Court; it is further

ORDERED that the Preference to be paid to the Agent, is fair and reasonable, and is APPROVED, without need for further application or order; it is further

ORDERED that, with respect to the Agent Expenses as provided in section 35 of the Agreement, the Court shall retain exclusive jurisdiction to determine any disputes regarding same, and that any of the Trustee or the Agent may seek one or more orders from this Court determining the same; it is further

ORDERED that the Agent shall have unavoidable, first-priority and perfected security interests and liens in all Unencumbered Net Proceeds (which, for the avoidance of doubt, does not include any of the $6,100,000.00 paid to the Trustee under section 17 of the Agreement), and unavoidable, second-priority and perfected security interests in all Encumbered Net Proceeds, as provided for in section 36 of the Agreement, without need for recording any U.C.C. financing statements, but which statements the Agent may record notwithstanding the automatic stay and without need for further order; it is further

ORDERED that, section 38 of the Agreement notwithstanding, the Trustee may not distribute any of the Unencumbered Net Proceeds without further order of the Court upon such motion as is appropriate, but the Trustee shall use his reasonable, good faith efforts to seek such relief when there are sufficient Unencumbered Net Proceeds, and the Agent may seek such relief at any time by appropriate motion; it is further

ORDERED that, with respect to any Encumbered Net Proceeds, the same may not be used or distributed by the Trustee pending an adjudication of alleged security interest and lien rights, and subject to the Estate's rights under 11 U.S.C. § 506(c); it is further

ORDERED that, for the avoidance of doubt, nothing in the Agreement or this Order permits the payment of any administrative expense, including professional fees, for which approval of the Court is otherwise required, unless and until such approval is otherwise sought and obtained as is otherwise appropriate; it is further

ORDERED that nothing in the Memorandum Opinion or this Order determines or prejudices any asserted security interest or lien against any Estate cause of action, and that all such alleged security interests and liens, as well as all defenses, avoidance actions, and other issues and claims related to the same are fully preserved; it is further

ORDERED that Claim No. 45, filed by JIG, is ALLOWED as a general unsecured claim in the amount of $10,000,000.00; it is further

ORDERED that, for the avoidance of doubt, the retention of Special Counsel (as defined in the Agreement) shall be subject to such approval by the Court as is otherwise appropriate; it is further

ORDERED that, for purposes of the investigation, prosecution, and potential recovery of Estate claims under the Agreement, the Trustee and the Agent shall share attorney-client and attorney work-product privileges with the Special Counsel; it is further

ORDERED that, for the avoidance of doubt, the Court's approval of the Agreement is *in toto* and the failure to specifically recite any provision of the Agreement in this Order in no way diminishes its effectiveness; it is further

ORDERED that the Agent is not a successor to, alter ego of or continuation of the Debtor under any theory of law or equity; it is further

ORDERED that the Agent is not assuming, nor be deemed to have assumed, any liability or obligation of the Debtor or its Estate; it is further

ORDERED that the automatic stay pursuant to 11 U.S.C. § 362 is hereby modified to the extent necessary, without further order of the Court, to allow the Agent to deliver any notice provided for in the Agreement and to take any and all actions permitted or required under the Agreement in accordance with the terms and conditions thereof; it is further

ORDERED that the Agent is a good-faith purchaser within the meaning of 11 U.S.C. § 363(m) and is entitled to the protections afforded thereby, and neither the Trustee nor the Agent have engaged in any conduct that would cause or permit the Agreement or any of the transactions contemplated thereby to be avoided or subject to monetary damages under 11 U.S.C. § 363(n), or that would prevent the application of 11 U.S.C. §§ 363(m) or 364(e); it is further

ORDERED that to the extent this Order is inconsistent with any prior order or pleading in this Chapter 7 case, the terms of this Order shall govern.  To the extent there is any inconsistency between the terms of this Order, the Memorandum Opinion, the December 6, 2024 preliminary oral bench ruling, and the terms of the Asset Purchase Agreement, the terms of this Order shall govern; it is further

ORDERED that this Order constitutes a final order within the meaning of 28 U.S.C. § 158(a), and notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), and pursuant to Bankruptcy Rules 7062 and 9014, and any applicable local rules, this Order shall not be stayed and shall be effective and enforceable immediately upon its entry, and time is of the

essence in closing the transactions referenced herein in order to preserve value for the Estate, and

Trustee and Agent are hereby authorized to close the Agreement as soon as practicable; it is further

ORDERED that the Court shall retain jurisdiction over the Agreement and the parties to

the Agreement in full, including to interpret and to enforce the Agreement, which jurisdiction shall

be core, including to supervise the Agent, grant relief to the Agent, control all funds and proceeds

collected by the Agent, to approve compromises reached by the Agent as provided for in the

Agreement, and to remove the Agent as provided for in the Agreement.

### END OF ORDER ###

AGREED:

| MUNSCH HARDT KOPF & HARR, P.C.<br><br>By: /s/ Davor Rukavina<br>Davor Rukavina, Esq.<br>Texas Bar No. 24030781<br>Thomas D. Berghman<br>Texas Bar No. 24082683<br>Brenda L. Funk<br>Texas Bar No. 24012664<br>Conor P. White<br>Texas Bar No. 24125722<br>4000 Ross Tower<br>500 N. Akard Street<br>Dallas, Texas 75201-6659<br>Telephone: (214) 855-7500<br>Facsimile: (214) 855-7584<br>Email: drukavina@munsch.com<br><br>**COUNSEL FOR SCOTT SEIDEL, CHAPTER 7 TRUSTEE** | By: Paul M. Rosenblatt *(w/permission)*<br><br>**KILPATRICK TOWNSEND & STOCKTON LLP**<br><br>Paul M. Rosenblatt, Esq.<br>Northern District of Texas Bar No. 614522GA<br>1100 Peachtree Street NE, Suite 2800<br>Atlanta, GA 30309-4528<br>-and-<br>2001 Ross Avenue<br>Suite 4400<br>Dallas, TX USA 75201<br>Telephone: (404) 815-6321<br>Facsimile: (404) 541-3373<br>Email: prosenblatt@kilpatricktownsend.com<br><br>**COUNSEL TO JACKSON INVESTMENT GROUP, LLC AND GLORIFI ACQUISITIONS, LLC** |

# Exhibit 4

**Certification to Court of
Appeals by All Parties
(Doc. No. 459)**

Frank J. Wright
State Bar No. 22028800
frank@fjwright.law
Jeffery M. Veteto
State Bar No. 24098548
jeff@fjwright.law
Law Offices of Frank J.
   Wright, PLLC
1800 Valley View Lane, Suite 250
Farmers Branch, TX 75234
Telephone: (214) 935-9100

Jeffrey S. Levinger
State Bar No. 122588300
jlevinger@levingerpc.com
J. Carl Cecere (Of Counsel)
State Bar No. 24050397
ccecere@cecerepc.com
Levinger PC
1445 Ross Avenue, Suite 2500
Dallas, TX 75202
Telephone: 214-855-6817
Facsimile: 214-855-6808

Ryan Downton
State Bar No. 24036500
ryan@thetexastrialgroup.com
The Texas Trial Group, PC
875 Carr 694, Ste. 103
Dorado, Puerto Rico 00646
Telephone: 512-680-7947

Joshua N. Eppich
State Bar No. 24050567
joshua@bondellis.com
Christian Ellis
State Bar No. 24007154
christian@bondsellis.com
Eric T. Haitz
State Bar No. 24101851
eric.haitz@bondsellis.com
C. Joshua Osborne
State Bar No. 24065856
c.joshosborne@bondsellis.com
Bonds Elis Eppich Shafer Jones LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
Telephone: 817-405-6900
Facsimile: 817-405-6902

*Counsel for With Purpose, Inc.*                *Counsel for WPI Collateral Management, LLC*

**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 23-30246-MVL-7** |
| **WITH PURPOSE, INC.,** | § | |
| | § | **Chapter 7** |
| **Debtor.** | § | |

## CERTIFICATION TO COURT OF APPEALS BY ALL PARTIES

An Amended Notice of Appeal having been filed in the above-referenced matter on January 31, 2025 (Doc. 420), Appellants With Purpose, Inc. and WPI Collateral Management, LLC (collectively "**Appellants**") and Appellees Scott M. Seidel, Trustee, Jackson Investment Group, LLC, and GloriFi Acquisitions, LLC (collectively

1

"**Appellees**") hereby certify to the Court under 28 U.S.C. §158(d)(2)(A) that a circumstance specified in 28 U.S.C. § 158(d)(2)(A)(iii) exists, warranting a direct appeal to the United States Court of Appeals for the Fifth Circuit.

1.     This certification arises in an appeal from the following orders entered by the United States Bankruptcy Court for the Northern District of Texas: (a) the oral bench ruling entered on December 6, 2025; (b) the Memorandum Opinion Denying Conversion to Chapter 11 and Granting the Trustee's Compromise with Jackson Investment Group Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure entered on January 22, 2025; (c) the Order Denying Motion to Convert Case to Chapter 11 entered on January 24, 2025; and (d) the Order Granting Trustee's Motion for Approval of Compromise and Settlement With, and Sale to, Jackson Investment Group, LLC, entered on January 24, 2025 (collectively, the "Orders on Appeal").

2.     All of the Appellants and all of the Appellees jointly certify that an immediate appeal of the Orders on Appeal to the U.S. Court of Appeals to the Fifth Circuit may materially advance the progress of the case or proceeding in which the appeal is taken.  *See* 28 U.S.C. § 158(d)(2)(A)(iii).

Dated: February 19, 2025                           Respectfully submitted,

*/s/ Ryan Downton*                                   */s/ Frank J. Wright*

Ryan Downton                                        Frank J. Wright
State Bar No. 24036500                          frank@fJwright.law
ryan@thetexastrialgroup.com              Jeffery M. Veteto
The Texas Trial Group, PC                   jeff@fJwright.law
875 Carr 694, Ste. 103                           Law Offices of Frank J. Wright, PLLC
Dorado, Puerto Rico 00646                   1800 Valley View Lane, Suite 250
Telephone: 512-680-7947                       Farmers Branch, TX 75234
                                                              Telephone: (214) 935-9100

2

Joshua N. Eppich
joshua@bondellis.com
Christian Ellis
christian@bondsellis.com
Eric T. Haitz
eric.haitz@bondsellis.com
C. Joshua Osborne
c. joshos boroe@bondsellis.com
Bonds Elis Eppich Shafer Jones LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
Telephone: 817-405-6900
Facsimile: 817-405-6902

*Attorneys for Appellant WPI Collateral
  Management, LLC*


*/s/ Davor Rukavina*
Davor Rukavina
drukavina@munsch.com
Thomas D. Berghman
tberghman@munsch.com
Munch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201

*Attorneys for Appellee Scott M. Seidel,
  Trustee*

Jeffrey S. Levinger
jlevinger@levingerpc.com
J. Carl Cecere (Of Counsel)
ccecere@cecerepc.com
Levinger PC
1700 Pacific Ave., Suite 2390
Dallas, TX  75201
Telephone: 214-855-6817
Facsimile: 214-817-4509

*Attorneys for Appellant With Purpose, Inc.*


*/s/ Paul M. Rosenblatt*
Paul M. Rosenblatt
prosenblatt@ktslaw.com
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Stret NE, Suite 2800
Atlanta, GA 30309

*Attorneys for Appellees
  Jackson Investment Group, LLC
  And GloriFi Acquisitions, LLC*


### CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2025, a true and correct copy of the foregoing document was served on all Notice Parties and all parties consenting to electronic service of this case *via* the Court's *ECF system* for the Northern District of Texas.

*/s/ Frank J. Wright*
Frank J. Wright

3